THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID SHERROD et al., Defendants-Appellants.

First District (2nd Division)   Nos. 1—88—1535, 1—88—1536 cons.

Opinion filed September 24, 1991.

Randolph N. Stone, Public Defender, of Chicago (Carol Howard, Assistant Public Defender, of counsel), for appellants.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Maureen P. Kelly, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

David Sherrod and Burnia Truman (collectively, defendants) appeal from their convictions by a jury of kidnaping, criminal sexual assault (by the use or threat of force) and aggravated criminal sexual assault against D.M. They claim that the acts which constituted the kidnaping were incidental to those which constituted the criminal sexual assault and that there was insufficient evidence to support either their criminal sexual assault or their aggravated criminal sexual assault convictions. They seek reversal of all their convictions, reversal with a remand for a new trial or vacation of the kidnaping and aggravated criminal sexual assault convictions with a remand for resentencing on the criminal sexual assault convictions.

D.M. testified that she had three 12-ounce beers while at her sister's home during the evening of May 24, 1987. At about 12:30 a.m.,

she was at the Williams Inn, in Chicago, where she had "[a] couple of malt liquors." She conversed with Larry Lane, whom she had known for about 12 years, after which Lane went outside to his car, which was parked in front of the Inn. She noticed Lane speaking with two men who were inside his car, and who were still there when she left the Inn and began to walk the five blocks to her home.

As D.M. walked past Lane's car, the two men exited it. Although she did not know their names, she recognized them, having seen them in her neighborhood several times. She identified them at trial as Sherrod and Truman. Defendants spoke to her in a friendly tone and she replied in a like manner as she continued walking home. Defendants then began walking with her, and she spoke with Sherrod about his cousin, who used to date her sister.

After walking a few blocks, Truman asked D.M. whether she would "like to give him some sex," and she replied, "No." Defendants followed this with pushing D.M. "[a]way from [her] house[,]" saying, "[S]hut up bitch and come on," and when D.M. tried to scream, Sherrod struck her.

Defendants next pushed D.M. into an alley and over to a garage with a door that was halfway open. Sherrod then knocked her down and covered her mouth. Defendants took her inside the garage, and, while Truman held her arms down, Sherrod pulled her pants down, hitting her in the mouth when she screamed. While Truman held her down, Sherrod forced her to have intercourse and threatened to kill her if she didn't "shut up." The two men then exchanged places, Sherrod holding D.M. down while Truman forced her to have sex. When she screamed, Truman hit her in the face. Defendants then put their pants on, and Sherrod suggested to Truman that she be killed. Instead, defendants left, after which D.M. put her clothes back on, walked home and called the police. Her "face was hurting and swollen" and her "vagina was hurting."

Niluardo Cay, a doctor at St. Bernard's Hospital, treated D.M. on the morning of May 25. She told him that she had been sexually assaulted. She was alert and responsive; Cay could not recall whether she appeared to have been crying.

Cay's examination revealed that D.M.'s breath smelled of alcohol, that she had abrasions in her upper mouth, that "[s]he complained of a slight discomfort in the lower abdominal area," that a pelvic examination revealed "abrasions in the perineal area," which is "the external area between the rectum and the vaginal area outside of the labium major" and that she had a "whitish vaginal discharge." Cay

stated that both the discharge and the abrasions were consistent with a sexual assault.

On cross-examination, Cay stated that D.M.'s blood alcohol level was .255%. He could not recall whether her cheeks were swollen or bruised, or whether she had bruises elsewhere. She had no abrasions inside her vaginal area. Additionally, the abrasions in the perineal area were consistent with "severe scratching" or "rough sex." Finally, Cay testified that the "whitish discharge" was also consistent with "[n]ormal vaginal discharge."

Earl Davis, a Chicago police officer, met with D.M. at about 4:30 a.m. on May 25. She told him that two men followed her, that they dragged "her into a garage a couple of blocks away, hit her, threatened her, forced her to have sexual intercourse with them, left her." She also told him that she knew her two assailants "from the neighborhood." Davis noted that D.M. "was crying. She had a bruise on her lip. She had debris on her clothing and in her hair. She was really very upset." When he and D.M. toured the crime scene, he recovered from the garage a shoe and hat, which D.M. identified as hers. After the search, he and D.M. went to the Williams Inn, where they found Lane. Lane denied knowing the defendants' names.

On cross-examination, Davis testified that he did not smell alcohol on D.M.'s breath and that she initially denied having had any alcohol. Later, however, she admitted to him that "[s]he might have had one [beer]." Although Davis' police report did not show that D.M. provided him with a description of the complexions of her assailants, and listed the hair color, eye color and other marks on their bodies as "[u]nknown," D.M. did tell Davis that her assailants were black males, and she told him their approximate ages. Davis also testified that she had a small cut on her lip, that her face was swollen and that he had to "guide her into the [police] car."

Lawrence Tuider, a Chicago police officer, investigated the assault on D.M. and interviewed her on May 26, 1987. He noted that she had a split lip, that she was emotionally upset and that she said she had some loose teeth. He showed her an array of five photos, from which she identified as one of her assailants a photo of Sherrod. On May 31, 1987, another photo array was shown to D.M., from which she picked out a photo of Truman. When Tuider asked whether she had the panties she wore on the night of the assault, to be used as evidence, she responded that she had destroyed them.

Thomas Byron, a Chicago police officer, testified that on July 11, 1987, D.M. viewed a police lineup and identified Truman as one of her assailants.

Neither defendant put on a defense. The parties stipulated, however, that during a preliminary hearing in the case against Truman on July 13, 1987, D.M. testified that when she arrived at the garage, Sherrod hit her and forced her to have sex. While he did so, Truman stood and waited, and kicked her "a couple of times." Truman then threw her down, hit and choked her, told her to be quiet and forced her to have sex.

After the jury convicted defendants, they were each given sentences of seven years in the custody of the Illinois Department of Corrections for kidnaping, 14 years for criminal sexual assault, and 16 years for aggravated criminal sexual assault, to be served concurrently.

■■ Defendants argue that their kidnaping convictions should be overturned because there was insufficient evidence that their detention of D.M. was for any other purpose than that of accomplishing the sexual assault, that it was inherent in the assault, and that it did not create any danger to her independent of the assault. The State responds that defendants waived review of this issue by their failure to raise it at trial and in their post-trial motions.

In *People v. Jackson* (1990), 203 Ill. App. 3d 1, 10, the court held that the defendant had waived review of whether "the unlawful restraint conviction should be vacated because it arose from the same physical act as the aggravated criminal sexual assault conviction" on the ground that he had failed to raise the issue in his post-trial motion, where the "alleged error neither affected defendant's substantial rights nor denied him a fair trial." (See also *People v. Nevitt* (1990), 135 Ill. 2d 423, 448.) In *People v. Alexander* (1991), 212 Ill. App. 3d 1091, 1103, however, the court held that an error which was not properly preserved would nevertheless be reviewed under Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)) as a "[p]lain error[ ] or defect[ ] affecting substantial rights" when "the error reasonably could have affected the verdict or if it would have resulted in a failure to afford the defendant due process of law." Since defendants could not have been convicted of both kidnaping and criminal sexual assault if their claim of error is valid, we deem it necessary to review this issue.

The State argues that the kidnaping convictions should stand because the defendants' asportation of D.M. was carried out separately from the sexual assault, required proof of different elemental facts and caused an independent danger to her.

The kidnaping convictions were based upon sections 10—1(a)(1) and (a)(2) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1985, ch. 38, pars. 10—1(a)(1), (a)(2)):

"Kidnaping occurs when a person knowingly: (1) And secretly confines another against his will, or (2) By force or threat of imminent force carries another from one place to another with intent secretly to confine him against his will \*\*\*."

The criminal sexual assault convictions were based upon section 12—13(a)(1) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 12—13(a)(1)):

"The accused commits criminal sexual assault if he or she:

(1) commits an act of sexual penetration by the use of force or threat of force \*\*\*."

In *People v. Eyler* (1989), 133 Ill. 2d 173, 199-200, in discussing the *"Levy-Lombardi* doctrine" (see *People v. Levy* (1965), 15 N.Y.2d 159, 204 N.E.2d 842, 256 N.Y.S.2d 793; *People v. Lombardi* (1967), 20 N.Y.2d 266, 229 N.E.2d 206, 282 N.Y.S.2d 519), the court held that " 'an aggravated kidnapping conviction should not be sustained where the asportation or confinement may constitute only a technical compliance with the statutory definition but is, in reality, incidental to another offense' " (kidnaping held not incidental to murder) (quoting *People v. Enoch* (1988), 122 Ill. 2d 176, 197).

Defendants cite *People v. Smith* (1980), 91 Ill. App. 3d 523, and *People v. Young* (1983), 115 Ill. App. 3d 455, in support of their claim that even though the multiple convictions in the instant case were not "carved from the same physical act" (*People v. King* (1977), 66 Ill. 2d 551, 566), their act of pushing D.M. away from the course she was pursuing to her house, into an alley and inside a garage could not support a kidnaping conviction along with a criminal sexual assault conviction. In *Smith,* the court enunciated a four-part test to determine whether an act constitutes kidnaping:

" '(1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense.' " (*Smith,* 91 Ill. App. 3d at 529, quoting *Government of Virgin Islands v. Berry* (3d Cir. 1979), 604 F.2d 221, 227 (following Virgin Islands law).)

The defendants in *Smith* were convicted of both "robbery of an automobile" and aggravated kidnaping after forcing themselves into the victim's car, threatening him to keep quiet and telling him that they wanted the car to escape from the authorities after a bank robbery. They drove off with the victim, despite his requests to be released, but soon let him out of the car and drove away. 91 Ill. App. 3d at 525.

The court noted that "[t]he victim was driven for a short distance—approximately 20 minutes from where he first encountered defendants. During that time, defendants took control of his car and personal property while threatening the use of force," and held that the defendants could not be convicted of aggravated kidnaping because:

> "Where it is determined that the asportation was only for a short period of time, occurred during the commission of a separate offense, and offered no significant danger to the victim independent of that posed by the felony [of robbery], an aggravated kidnapping charge should not rest." 91 Ill. App. 3d at 529.

In *Young*, an aggravated kidnaping conviction was based on "defendant's act of grabbing and throwing the complainant against the wall of [a] shed immediately prior to the rape." The complainant had voluntarily gone inside the shed with the defendant. (*Young*, 115 Ill. App. 3d at 469.) The court reversed the aggravated kidnaping conviction, holding:

> "The duration of the detention was only for the period of time necessary to accomplish the rape and, in fact, marked the beginning of the struggle culminating in the rape. It is also clear that the act relied upon was inherent in the rape itself, since at some point in time complainant had to be restrained in some manner in order to accomplish the rape. Finally, it cannot be said that this overt act created any significant danger to the victim independent of that posed by the separate offense of rape. Under these circumstances, it is our opinion that although this act was a separate overt act under *King*, [66 Ill. 2d at 566,] it was not an act which could support the offense of kidnapping." (115 Ill. App. 3d at 470.)

Applying the *Smith* factors to the case at bar, we hold that the defendants' kidnaping convictions were proper. In *People v. Casiano* (1991), 212 Ill. App. 3d 680, 687-88, the court noted that an asportation lasting approximately 1½ blocks, which allowed a criminal sexual assault to be carried out more easily in the defendant's apartment and with less chance of detection, was sufficiently lengthy to satisfy the first part of the *Smith* test. Similarly, in the case at bar, D.M. was forced off the street, into an alley and then into a garage; "[w]hether an asportation is sufficient to constitute a kidnapping depends on the particular facts and circumstances of each case" (*Casiano*, 212 Ill. App. 3d at 687), and here, the asportation satisfied this first factor.

The remaining parts of the *Smith* test are just as clearly met. D.M.'s asportation took place before, not during, the sexual assault, thus distinguishing it from the circumstances in *Smith*, where the victim was detained and moved while his car was stolen (*Smith*, 91 Ill. App. 3d at 529), and from those in *Young*, in which the victim was not moved and was detained only while the rape was committed. (*Young*, 115 Ill. App. 3d at 470.) Next, the asportation from the street to the garage was certainly not inherent in the sexual assault. (*Eyler*, 133 Ill. 2d at 200 (confinement necessary to brutalize victim not incidental to victim's murder); *Casiano*, 212 Ill. App. 3d at 688; see also *People v. Gully* (1986), 151 Ill. App. 3d 795, 800 (defendant need not have moved victim to a secluded area in order to sexually assault her).) Finally, forcing an unwilling D.M. into the alley and into the garage posed a significant danger to her separate from that posed by the sexual assault. (*Casiano*, 212 Ill. App. 3d at 688; *Gully*, 151 Ill. App. 3d at 800.) Therefore, since defendants were properly convicted of kidnaping and were also properly convicted of aggravated criminal sexual assault (during the course of the commission of kidnaping) (section 12—14(a)(4) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(4))), there is no need to determine, as they have requested, whether there was sufficient evidence to convict them of aggravated criminal sexual assault predicated upon other factors (causing bodily harm; threatening or endangering life (sections 12—14(a)(2), (a)(3) of the Code (Ill. Rev. Stat. 1985, ch. 38, pars. 12—14(a)(2), (a)(3))).

Next, defendants claim that there was insufficient evidence to support their criminal sexual assault convictions. They contend that D.M. changed her version of the events too many times to be credible, that her testimony during Truman's preliminary hearing was inconsistent with her trial testimony, that her denial to Officer Davis that she had been drinking was proven false by her high blood-alcohol level, that Doctor Cay failed to confirm some of her alleged injuries and that the State failed to analyze a Vitullo kit, which could have helped determine whether she had had physical contact with the defendants.

The State responds that defendants cannot rely on appeal on that portion of the testimony adduced during Truman's preliminary hearing which was not stipulated to at trial, that D.M.'s credibility was properly a matter for the jury to decide and that its determination of guilt was reasonable.

■ The State correctly asserts that statements made during a preliminary hearing, even if part of the record on appeal, may not be considered if they were never made part of the trial record. (*People v. Owens* (1977), 46 Ill. App. 3d 978, 988.) Accordingly, this court, view-

ing the evidence adduced at trial in the light most favorable to the prosecution, including that portion of the preliminary hearing testimony which was stipulated to at trial, in order to determine whether any " 'rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' " (*People v. Phillips* (1989), 127 Ill. 2d 499, 510, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789), holds that defendants' criminal sexual assault convictions were properly supported by the evidence.

■ Defendants point to D.M.'s statements during that portion of her preliminary hearing testimony introduced at trial in which she alleged that Truman had kicked and choked her, an allegation she did not repeat at trial. In addition, D.M. testified at trial that Sherrod threatened to kill her, a charge she did not make during her preliminary hearing testimony. Defendants overlook, however, that these claimed inconsistencies, along with D.M.'s allegedly false statement to Officer Davis that she had not been drinking or had had very little to drink, were properly before the jury for it to judge accordingly. Moreover, there were no inconsistencies in D.M.'s testimony about the rape itself, in addition to which there was ample evidence of injuries resulting from the attack. Accordingly, we hold that the jury most assuredly did not act unreasonably in finding D.M.'s testimony to be credible and in convicting defendants of criminal sexual assault.

Finally, pursuant to *People v. King* (1977), 66 Ill. 2d 551, 566, we reverse defendants' convictions for criminal sexual assault, which were predicated upon the same acts as those for which they were convicted of aggravated criminal sexual assault.

For all of the foregoing reasons, the defendants' convictions for criminal sexual assault and the sentences thereon are vacated, and the remaining convictions are affirmed.

Affirmed in part, reversed in part.

HARTMAN and DiVITO,* JJ., concur.

---

*Although Judge DiVito did not participate in the oral argument had in this case, he has read the briefs and has otherwise participated in the decision-making process.