THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAVEL LURKS, Defendant-Appellant.

First District (2nd Division)   No. 1—90—0910

Opinion filed January 26, 1993.

Rita A. Fry, Public Defender, of Chicago (Fred Weil, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Christine Cook, and Thomas J. Darman, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McCORMICK delivered the opinion of the court:

Defendant, Lavel Lurks, appeals from his convictions and sentences for aggravated criminal sexual assault, aggravated kidnaping and armed robbery. We affirm. The trial court properly accepted the verdict despite two jurors' expressions of reservations about the verdict. Because the kidnaping was not merely incidental to the other offenses, we find that the separate conviction for that offense could stand. Since the sentences are supported by appropriate factors, we also affirm the sentences.

Shortly after 5 a.m. on June 25, 1988, the victim, C.V., left the home where she lived with her boyfriend, Tony McDougall, and his family, to go to work. She was 17 years old and about one month pregnant with Tony's child. She and Tony planned to marry.

After she had walked a few blocks, two men came up behind her. One held a wooden board about 2½ feet long and the other one had a gun. When she walked past an alley the men each grabbed one of her arms and asked her if she had any money. She said she had no money and she was pregnant. The man with the gun tripped her when she tried to run away. The men took her to the alley and took a sterling silver ring from her. The men took her to a nearby abandoned building and up three flights to an apartment where they threatened to beat her with the board if she made trouble. They repeatedly raped her vaginally, orally and anally for more than an hour. When they left, she ran back to her boyfriend's home and reported the rape to the police. She went to the hospital where she was treated and released. She returned to the hospital two days later when she experienced vaginal bleeding and sharp abdominal pain. She had lost the fetus.

On July 3, 1988, the victim identified defendant in a police lineup as the man with the gun who had raped her. About 10 days later, she picked a photograph of Calvin Evans out of a photographic lineup as the man who had the board. Police have tried repeatedly, unsuccessfully, to locate and apprehend Calvin Evans.

On July 7, 1988, police questioned defendant after informing him of his *Miranda* rights. Defendant told police that on June 25 after he and a friend named Evans smoked several joints, Evans said he wanted some "pussy." The victim walked past, and Evans, who had a

bat, came up behind her and grabbed her arm. Defendant watched Evans take the victim into an abandoned building and a few minutes later he followed. Defendant admitted that the victim told them she was pregnant. He had intercourse with her while Evans stood over her, holding the bat.

The State tried defendant on eight counts of aggravated criminal sexual assault, one count of aggravated kidnaping and one count of armed robbery.

The victim identified defendant again in court as one of the men who raped her. Dr. Hermes Ayuste testified that he examined the victim on June 27, 1988, and he determined that she had spontaneously aborted the fetus. He said that emotional trauma is, in general, a possible cause of spontaneous abortion, and that the traumatic rape could possibly have caused the victim's spontaneous abortion. He admitted that some medical authorities state that as many as 30% of all pregnancies spontaneously miscarry in the first trimester. He also agreed that physical trauma, even the kind of physical trauma the victim suffered, was not likely to have caused this first trimester miscarriage.

The trial court allowed the jury to consider three counts of aggravated criminal sexual assault and the counts of aggravated kidnaping and armed robbery. The jury found defendant guilty on all five counts. Defendant asked the court to poll the jury. After several jurors said that these were their verdicts, the following exchanges took place:

"THE COURT: Robert Phillips, were these then and are these now your verdicts?

JUROR PHILLIPS: I had a problem with the charging this young man with everything and the other fellow is not here to be charged with anything. It could very well be that there was some type of influence that put this young man in this position.

THE COURT: Well, sir, you have signed thé verdict forms, is that right?

JUROR PHILLIPS: Yes.

THE COURT: When you signed those verdict forms were you voting that the Defendant be found guilty in each one of these counts?

JUROR PHILLIPS: Well, yes.

THE COURT: Do you at this time—is it still your verdict, guilty on each one of those counts?

JUROR PHILLIPS: I can't do anything about it now, so yes.

THE COURT: Well, sir, I am asking you now, you certainly can do something about it, this is a very important decision and

I want you to be comfortable making your final decision. At the time you signed it was it your verdict?

JUROR PHILLIPS: If the other young man—if—

THE COURT: Well, to tell you the truth we are not going to reargue the case and I don't mean to cut you off, this is not the time to continue deliberations, if you do not have a verdict that is one thing, but my question to you is at the time you signed these pieces of paper was that your verdict of guilty?

JUROR PHILLIPS: Yes.

THE COURT: As you sit here now is it still your verdict on each one of these counts?

· JUROR PHILLIPS: Yes.

* * *

THE COURT: Miss Sides, were these then and are these now your verdicts?

JUROR SIDES: (No response.)

THE COURT: Miss Sides.

JUROR SIDES: With some application, yes—yes, just take yes as the answer.

THE COURT: Okay, you are saying that when you signed these this was your verdict—

JUROR SIDES: I had a problem with one of them, but yes.

THE COURT: And when you signed them it was your verdict?

JUROR SIDES: The answer is yes.

THE COURT: And at this point too it is your verdict, is that right?

JUROR SIDES: Yes."

The other jurors stated, without qualification, that those were their verdicts. Defendant argued in his motion for new trial that the court should have sent the jury back for further deliberations in light of the two jurors' hesitations. The court denied the motion, finding that the jurors indicated that those were their verdicts.

The trial judge, in passing sentence, expressly considered the severity of the crime, defendant's age, and defendant's prior convictions for robbery and attempted burglary. The court also said:

"[C.V.] was living with her boyfriend and his family in a family situation. He was working. She was just barely pregnant. She was beginning a new life *** . You ruined her life and the life of that child.

Now, there was no specific evidence to show that your actions caused the miscarriage that resulted here and I cer-

tainly am not going to sentence you to punish you for that because *** we can't say what necessarily caused her miscarriage. But I think it's very clear from reading, for example, the victim impact statement here that the loss of that child and the destruction of the life that she knew at that time is something that she's going to have to live with a long time and, sir, you will have to as well.

***

*** [T]he legislature has [established that] *** the type of horror that this young woman went through where you and another man attacked her in every way that a perverted mind could possibly think of, that that is such a horror that an additional sentence would be appropriate.

The legislature has also said that while certainly violent crimes are a horrible thing, *** they can have more significant impact if the victim is a young person. Here she was a young girl. She was 17 years old. She was living in a happy, stable family situation until you attacked her in the way that you did. And we heard that she didn't marry the young man and she doesn't live with his family anymore and she doesn't have a baby anymore. Her life significantly changed. *** [T]hat factor, the State legislature has also set out, is a basis for sentencing you to more than that 30 year sentence. And based upon that factor as well I will certainly take into account.

Mr. Lurks, what I'm saying is I think that it's clear in this case the sentence must be extended."

The victim impact statement is not included in the record on appeal. Although the victim testified that she no longer lived with Tony, nothing in the record supports the court's assertion that life with the McDougalls had been happy or stable.

The trial court sentenced defendant to 45 years' imprisonment for aggravated criminal sexual assault, 30 years' imprisonment for armed robbery and 15 years' imprisonment for aggravated kidnaping, all sentences to run concurrently. The order of sentence shows convictions for five counts of aggravated criminal sexual assault, including two counts charging as aggravation the use of force which caused the bodily harm of a miscarriage. One part of the order shows convictions and sentences for both armed robbery and aggravated kidnaping; another part of the order omits the aggravated kidnaping conviction.

■ Defendant argues that we must reverse the conviction because the trial court precluded two jurors from expressing their dis-

sent from the verdicts. Our supreme court restated pertinent principles in *People v. Cabrera* (1987), 116 Ill. 2d 474, 490, 508 N.E.2d 708:

" ' "The polling of a jury is intended 'to ascertain whether any juror had been coerced into agreeing upon a verdict—coerced by his associate jurors.' [Citation.] While polling the jury, a trial court must be careful not to hinder a juror's expression of dissent." [Citation.]' *(People v. Williams* (1983), 97 Ill. 2d 252, 307[, 454 N.E.2d 220].) The trial judge, in determining whether a juror has freely assented to the verdict, not only hears the juror's response, but observes the juror's demeanor and tone of voice during the course of the polling of the jury. *(People v. Kellogg* (1979), 77 Ill. 2d 524, 529[, 397 N.E.2d 835]; *People v. Herron* (1975), 30 Ill. App. 3d 788, 792[, 332 N.E.2d 623].) A trial court's determination as to a juror's voluntariness of his assent to the verdict will not be set aside unless the trial court's conclusion is clearly unreasonable."

In *Cabrera*, as here, the court asked, "Was this and is this now your verdict?" *(Cabrera*, 116 Ill. 2d at 488.) The juror in *Cabrera* started to give an answer other than yes or no and the trial court, like the trial court here, cut off the answer and insisted on a yes or no answer. The juror in *Cabrera*, like both jurors here, said yes. The trial court in *Cabrera*, at hearing on a post-trial motion, said that the juror did not show a desire to recant her verdict. Similarly, the trial judge here accepted the verdicts based upon the responses the jurors gave to her questions, where they reaffirmed their verdicts after she specifically told them that they could recant the verdicts even though they signed the verdict forms.

Our supreme court stated in *Cabrera* (116 Ill. 2d at 490):

"It cannot be said that the determination of the trial judge here that the juror voluntarily assented to the verdict and did not wish to repudiate it is clearly unreasonable. When Ms. Ciancanelli understood that she was to respond with a yes or no answer, she unequivocally answered yes when the judge inquired: 'Was this and is this now your verdict?' The situations in *People v. Kellogg* (1979), 77 Ill. 2d 524, and *People ex rel. Paul v. Harvey* (1972), 9 Ill. App. 3d 209, [292 N.E.2d 124,] which decisions the defendant cites, clearly are distinguishable. In *Kellogg* the juror inquired of the court as to whether she might change her vote, and in *Harvey* the juror, when asked if the verdict was his, responded: 'Well, it wasn't exactly, no.' "

The responses of the jurors here, like the response in *Cabrera*, support the judgment. We cannot say that the determination that both jurors voluntarily assented to the verdict is clearly unreasonable.

■ Defendant contends that this court should vacate the aggravated kidnaping conviction because the asportation here was incidental to the robbery. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 197, 522 N.E.2d 1124.) To determine whether an act which technically includes the elements of aggravated kidnaping is merely incidental to another offense the court should look at four factors:

> " '(1) [T]he duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense.' " *People v. Smith* (1980), 91 Ill. App. 3d 523, 529, 414 N.E.2d 1117, quoting *Government of the Virgin Islands v. Berry* (3d Cir. 1979), 604 F.2d 221, 227.

In *People v. Sherrod* (1991), 220 Ill. App. 3d 429, 581 N.E.2d 53, as in this case, the defendants took their victim a short distance to a secluded place to rape her. This court said:

> "Applying the *Smith* factors to the case at bar, we hold that the defendants' kidnaping convictions were proper. In *People v. Casiano* (1991), 212 Ill. App. 3d 680, 687-88, [571 N.E.2d 742,] the court noted that an asportation lasting approximately 1½ blocks, which allowed a criminal sexual assault to be carried out more easily in the defendant's apartment and with less chance of detection, was sufficiently lengthy to satisfy the first part of the *Smith* test. Similarly, in the case at bar, D.M. was forced off the street, into an alley and then into a garage; '[w]hether an asportation is sufficient to constitute a kidnapping depends on the particular facts and circumstances of each case' (*Casiano*, 212 Ill. App. 3d at 687), and here, the asportation satisfied this first factor.
>
> The remaining parts of the *Smith* test are just as clearly met. D.M.'s asportation took place before, not during, the sexual assault, thus distinguishing it from the circumstances in *Smith*, where the victim was detained and moved while his car was stolen (*Smith*, 91 Ill. App. 3d at 529), and from those in [*People v.*] *Young* [(1983), 115 Ill. App. 3d 455, 450 N.E.2d 947], in which the victim was not moved and was detained only while the rape was committed. (*Young*, 115 Ill. App. 3d at 470.) Next,

the asportation from the street to the garage was certainly not inherent in the sexual assault. ([*People v.*] *Eyler* [(1989), 133 Ill. 2d 173, 200, 549 N.E.2d 268] (confinement necessary to brutalize victim not incidental to victim's murder); *Casiano*, 212 Ill. App. 3d at 688; see also *People v. Gully* (1986), 151 Ill. App. 3d 795, 800[, 502 N.E.2d 1091] (defendant need not have moved victim to a secluded area in order to sexually assault her).) Finally, forcing an unwilling D.M. into the alley and into the garage posed a significant danger to her separate from that posed by the sexual assault." *Sherrod*, 220 Ill. App. 3d at 435-36.

Defendant attempts to distinguish *Sherrod* on the basis of the conviction for armed robbery here. The robbery began in the alley when defendant and Evans took the victim's ring. Defendant contends that the robbery was not complete until Evans removed a knife from the victim's bag while they were in the abandoned building. This distinction affects only the second of the four *Smith* factors, since the asportation was not inherent in the robbery, and the asportation posed a far greater danger to the victim than the robbery. Defendant shows two separate acts of robbery, not one continuing robbery occurring during the asportation and detention. One act of robbery preceded the asportation, and the other occurred after the asportation was complete, during the detention and rape. Applying the *Smith* factors in this case, as in *Sherrod*, the aggravated kidnaping is sufficiently distinct from the other offenses to support the separate conviction.

■ Defendant next argues that the trial court considered improper factors in sentencing defendant. The court expressly considered in aggravation defendant's prior convictions, the severity of the crime, the victim's age, and the fact that two men participated in the rape. The legislature has established that when the victim is under 18 years old, or when more than one person participates in the rape, an extended-term sentence may be appropriate. Ill. Rev. Stat. 1987, ch. 38, pars. 1005—5—3.2 (b)(5), (c).

The trial judge expressly did not sentence defendant for causing the miscarriage, but the judge expressly took into account the significant changes in the victim's life following the rape, including her failure to marry Tony McDougall and her loss of the fetus. The trial judge apparently meant that she would not sentence defendant on the counts charging sexual assault aggravated by "bodily harm to [C.V.] by causing a miscarriage," as charged in two counts, because the State failed to prove that defendant caused the miscarriage. However, the judge decided that she could take into account the effect of the

crime upon the victim, as shown by the changes in the victim's life, in sentencing on the other counts of aggravated criminal sexual assault.

The appellate court defers to the trial court's decisions concerning sentencing and presumes that the trial court considered only appropriate factors in sentencing, unless the record affirmatively shows otherwise. (*People v. Gant* (1974), 18 Ill. App. 3d 61, 66, 309 N.E.2d 265.) Trial courts have a duty to weigh all statutory factors in aggravation and mitigation, including the effect of the crime upon the victim. (*People v. Pavlovskis* (1992), 229 Ill. App. 3d 776, 784, 595 N.E.2d 587.) "[T]he probability of permanent psychological harm to the victim is an important sentencing factor." (*People v. Fisher* (1985), 135 Ill. App. 3d 502, 506, 481 N.E.2d 1233.) Although the court cannot base a sentence on a "vague guess about generalized possibilities of harm" (*People v. Andrews* (1991), 210 Ill. App. 3d 474, 484, 569 N.E.2d 192), the court may consider the possibility of harm to the victim when there is sufficient evidence of the possibility. *Andrews*, 210 Ill. App. 3d 474.

Here, the victim's doctor testified that the rape and the attendant emotional trauma could possibly have caused the abortion. The trial court appropriately considered this possibility of harm as an aggravating factor.

However, there is no evidence in the record connecting the rape to the victim's decision to move out of the McDougall house and her failure to marry Tony. The trial court could not properly consider those facts in aggravation.

> "[R]eliance on an improper factor in aggravation does not always necessitate remandment for resentencing. Where the reviewing court is unable to determine the weight given to an improperly considered factor, the cause must be remanded for resentencing. [Citations.] However, where it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required." *People v. Bourke* (1983), 96 Ill. 2d 327, 332, 449 N.E.2d 1338.

In *People v. Kelchner* (1991), 221 Ill. App. 3d 25, 581 N.E.2d 793, the trial court listed both proper and improper factors, including harm to the victim, in imposing an extended-term sentence. Although the record did not contain sufficient evidence to show that defendant's conduct caused the harm, the appellate court affirmed the sentence, finding that the court relied on the proper factors, and the "improper consideration of serious harm did not result in defendant receiving a

greater sentence than would have been imposed without it." *Kelchner*, 221 Ill. App. 3d at 33.

Here the trial judge properly sentenced defendant to an extended term based on the participation of two persons in the rape, the victim's age and the possibility of psychological harm to the victim. The sentence is in the middle of the 30- to 60-year range for extended-term sentences for aggravated criminal sexual assault. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2(a)(2).) We find that the trial court placed no significant weight in sentencing on facts about the victim's life which were not shown to be causally connected to the rape. The court's consideration of the victim's move out of the McDougall house and her failure to marry Tony did not lead to the imposition of a greater sentence than the court would have imposed otherwise. Therefore we affirm the sentences.

For the reasons stated above, the convictions and sentences are affirmed. In accord with defendant's request, we order correction of the mittimus to show conviction on one count of aggravated kidnaping, one count of armed robbery and three counts of aggravated criminal sexual assault, not five. See *People v. Ammons* (1983), 120 Ill. App. 3d 855, 863, 458 N.E.2d 1031.

Affirmed as modified.

HARTMAN and SCARIANO, JJ., concur.