2022 IL App (1st) 192149-U

No. 1-19-2149

Order filed May 31, 2022

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 20259 |
| | ) | |
| STEVEN PODKULSKI, | ) | Honorable |
| | ) | Michael J. Kane, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's conviction for intentional first degree murder is affirmed where (1) the trial court's admission of evidence of defendant's other bad acts was not an abuse of discretion, and (2) the record is not sufficiently developed to resolve his claim of ineffective assistance. Defendant's conviction for knowing murder is vacated under the one-act, one-crime rule.

¶ 2   Following a bench trial, defendant Steven Podkulski was found guilty of two counts of first degree murder (729 ILCS 5/9-1(a)(1), (2) (West 2002)) and sentenced to concurrent terms of 45 years' imprisonment. On appeal, defendant contends that defense counsel was ineffective for

failing to impeach a State witness with her prior inconsistent statement from the grand jury proceedings, and the trial court erred by (1) admitting evidence of defendant's other bad acts and (2) convicting him of multiple counts of murder arising from the killing of a single victim. We affirm in part and vacate in part.

¶ 3    Defendant was charged by indictment with five counts of murder for allegedly killing Jennifer Boyd on August 3, 2002. The State proceeded on three counts, alleging that defendant stabbed and killed Boyd intentionally (count I), knowing that he created a strong probability of death or great bodily harm (count II), and that the murder occurred during an armed robbery (count III).

¶ 4    Prior to trial, the State filed three motions *in limine* to allow other crimes evidence. Specifically, the State sought to admit evidence that (1) defendant threatened to kill witness Lauren Munch; (2) defendant and witness James Goble committed burglaries and kept the proceeds in storage facilities; and (3) in January 2017, witness Michael Sias visited defendant in the hospital, handed him several bags of heroin and some tobacco, and defendant said, "[t]hat girl got what she had coming to her. They will never be able to convict me."

¶ 5    At a hearing, the trial court granted the first and second motions *in limine*. Regarding the third motion, the State advised the court that on January 4, 2017, defendant, while in Cook County Jail, called Sias. He stated that he planned to injure himself so that he would be taken to Stroger Hospital (Stroger), and requested Sias bring contraband to him at Stroger. On January 5, 2017, defendant was transported to Stroger and placed next to an individual named Mario Ellis, who coincidentally knew Sias. Through Ellis, defendant arranged to meet Sias. Defendant made the relevant statement that "[t]hat girl got what she had coming to her. They will never be able to convict me," when Sias passed defendant contraband during their meeting. Defendant then called

Sias on January 7, 2017, and they discussed the coincidental placement of defendant near Ellis in the hospital.

¶ 6    The State argued that the circumstances of defendant's statement were relevant and "must be before the trier of fact for that statement to make any sense." Defense counsel argued that testimony about the contraband would require a "mini trial" diverting attention from the charged offense. According to counsel, the 2017 statement had no nexus with the 2002 incident and was not legally an admission. The court ruled that the alleged statement was admissible, but evidence that the contraband comprised narcotics was not.

¶ 7    The State subsequently sought to admit the content of the telephone conversations between defendant and Sias. Defendant filed a written reply, arguing that the taped conversations did not meet the requirements for admission of other crimes evidence, were inadmissible hearsay, and were unnecessary as Sias would testify about the details relevant to the context of defendant's statement.

¶ 8    During a subsequent proceeding, defense counsel reiterated his argument that the content of the two telephone conversations between defendant and Sias was "not admissible under any theory." The court responded that the narcotics evidence was inadmissible, but the State could introduce evidence regarding "the statement and *** the phone conversation between Mr. Sias and the defendant excluding, again, anything with regards to narcotics use."

¶ 9    At trial, Bolingbrook police officer James Burke testified that he worked in Bedford Park on August 3, 2002. He responded to Bedford Park Public Storage (Public Storage) and learned that someone heard a banging noise, and "possibly help, help," coming from inside a locker. Eventually, Burke discovered Boyd inside a locker, face down in a pool of blood. She was

pronounced dead at the scene. Burke identified photographs of the scene and Boyd's body, which are included in the record on appeal.

¶ 10     Bedford Park police lieutenant Steven Lindich testified that he observed Boyd lying face down in a pool of blood.[1] Lindich identified the photographs of the scene, the office, and Boyd's body. Lindich commented that the photograph of Boyd lying face down shows two "swipe marks" on the left and right buttocks of her jeans. Lindich never informed the press about the "swipe marks." Lindich learned that a small purse containing Boyd's credit card was taken, and her credit card was used at a gas station to purchase gasoline.

¶ 11     The State entered a stipulation that Dr. Kendall Crowns performed an autopsy of Boyd on August 4, 2002, and determined that she died from multiple stab wounds and the manner of death was homicide. The State entered a certified copy of the postmortem examination into evidence, which is included in the record on appeal.

¶ 12     Goble testified that he had multiple felony convictions. In 2002, he committed burglaries with defendant and they placed the proceeds in public storage units. On August 3, 2002, Goble and defendant were with Kimberly Williams, Munch, and Nancy Abeyta in Sterling Estates, Illinois. Goble, defendant, Munch, and Abeyta then traveled to Public Storage to rent a locker.

¶ 13     Defendant and Goble entered the office, and after 10 minutes, Goble returned to the vehicle. Goble then observed defendant leave the office with Boyd, the manager of the facility. Defendant and Boyd went through the gate leading to the "back of the units." After 5 or 10 minutes, defendant exited the locker area alone and with blood on his pants and shirt. Later, defendant called

---

[1] Lieutenant Steven Lindich testified that he was a detective on August 3, 2002.

Goble and arranged to borrow clothes from him. When defendant arrived, he burned his clothes in a grill.

¶ 14    Three days later, defendant told Goble that "he decided he was going to burglarize the place, went to push [Boyd] into the locker, and she put up a fight and he killed her" by stabbing her with a knife. Goble testified that defendant typically carried a Leatherman knife. Defendant further stated that he threw the knife "in the drink," which Goble understood to mean the river, and also that he took Boyd's credit card and gave it to another man to be blamed. Goble testified that he did not "ask for a deal" and was made no promises in connection with his testimony.

¶ 15    Goble identified photographs of Public Storage, Boyd, and a Leatherman knife similar to the one defendant carried. These photographs are included in the record on appeal.

¶ 16    On cross-examination, Goble acknowledged that he committed burglaries to support a drug habit and, in February 2004, was imprisoned for burglary. At that time, Goble wrote to the police offering information about the killing at Public Storage in exchange for immunity in the case, the dropping of his charges pending on December 1, 2022, work release, review of documents by an attorney prior to his signing, a pizza, and a pack of Marlboro Light cigarettes. He also inquired about a reward. The police informed Goble that they needed more information, so he told them about a different crime.

¶ 17    On August 9, 2014, Goble signed a proffer agreement with the Cook County State's Attorney's Office, providing that his statements relating to his criminal activity could not be used against him in criminal proceedings. Goble could have been prosecuted had he committed the murder, but otherwise, he "could talk about what happened."

¶ 18    On redirect examination, Goble testified that the proffer agreement let him "tell what [he] knew happened that day." Goble did not believe that the proffer agreement gave him immunity if

the State could prove he committed a crime. In his 2004 letter, Goble did not request immunity for violent crimes. The proffer agreement and the 2004 letter were admitted into evidence and are included in the record on appeal.

¶ 19    Munch testified that she was convicted of misdemeanor theft and possession of a stolen motor vehicle in 2003. In 2002, Munch was in a relationship with defendant and lived with him. On August 3, 2002, she traveled with defendant to Public Storage, and Goble and Abeyta arrived in a separate vehicle. Munch stayed in the vehicle when defendant and Goble entered the office to rent a storage unit.

¶ 20    Defendant and Goble exited the office with a woman and walked to the lockers. Munch then heard "a female kid-like scream." Defendant and Goble ran to the vehicle and defendant, who was not wearing a shirt, took the keys and walked to the trunk. Defendant was "very agitated," said that "[w]e need to get the hell out of here," and drove back to Sterling Estates. Defendant and Goble then burned defendant's clothes and Leatherman knife.

¶ 21    Munch and defendant ended their relationship a few days later, and subsequently traveled together to a storage locker facility in Plainview, Illinois. Defendant told Munch to remove her belongings from his storage locker, which was the size of a garage and contained box trailers. Then, defendant "shoved" Munch inside a trailer, locked the doors, and turned on a propane tank. He stated that yelling "would not help *** because [she] would be dead just like the other girl in a matter of minutes." Eventually, defendant released her. Subsequently, defendant sent Munch letters "threatening to kill [her] and any offspring [she] might have." In 2004, Munch was interviewed by police officers, but did not tell them what she knew about the murder because she feared defendant.

¶ 22     On cross-examination, Munch stated that she was part of defendant and Goble's "burglary ring," and during that time, used alcohol and marijuana. A few days after the murder, Abeyta died from an overdose, and defendant told Munch "it was done on purpose by Goble." Munch stopped seeing defendant in October 2002, but did not contact the police after their relationship ended.

¶ 23     Defense counsel published an excerpt from Munch's grand jury testimony from October 2014, wherein she testified that she, defendant, and Goble traveled to Public Storage. Defense counsel questioned Munch about her failure to tell the grand jury that the group arrived in separate vehicles, and Munch stated, "[t]his comes back to me in parts as it has during the years, and what parts have been [*sic*] come back to me since it was a traumatic event I have reported to the cops."

¶ 24     Defense counsel then asked Munch about an email she wrote to the Bedford Park Police Department on May 31, 2017. In the email, Munch wrote that when everyone returned to Sterling Estates following the incident at Public Storage, Munch heard Goble and Abeyta argue and Goble said, "I just killed someone. If they find out I am going to prison." Munch also wrote that Goble burned a Leatherman knife in a barbeque pit. In August 2014, Munch signed a proffer agreement wherein the State agreed not to prosecute her in the matter in exchange for what she disclosed about the incident.

¶ 25     The court questioned Munch about her observations of defendant, Goble, and the woman as they walked to the lockers. She testified that they were gone 15 to 20 minutes, and she observed Goble attempt to enter the front office, return to the lockers, and run back to the vehicle.

¶ 26     Diane Bahr testified that defendant was a friend of Matthew Christianson, her ex-boyfriend.[2] One day in September 2002, Bahr, Christianson, and defendant smoked marijuana

---

[2] Throughout the proceedings, Diane Bahr is also referred to as Diane Weiss.

together. Bahr overheard defendant tell Christianson that he "messed up" by killing a woman at a storage unit because she surprised him. Defendant told Christianson that the woman worked at the facility, and defendant "shoved her" inside a storage unit. The woman yelled, and defendant stabbed her "to shut her up." He wiped the knife on her pants and put it in his pocket. Despite using marijuana, Bahr "had [no] problem" remembering the conversation. In 2014, police officers found Bahr and she discussed the case. A few months later, a detective told her about a reward. On cross-examination, Bahr stated that Public Storage awarded her $25,000 in 2015 or 2016.

¶ 27    Brian Pedersen testified that he worked for Public Storage and knew Boyd. Pedersen explained that when a customer wants to rent a locker, the employees leave the office to escort the customer to the locker and unlock it. Pedersen identified photographs of the office, a lease agreement for the locker with Boyd's signature, and a customer lease package for renting a locker, which are contained in the record on appeal.

¶ 28    Bedford Park police sergeant Andrew Smuskiewicz testified that in January 2013, he investigated the cold case murder of Boyd. On May 14, 2014, Smuskiewicz interviewed Bahr without providing details about the case he was investigating. Bahr never asked Smuskiewicz about a reward, and he only mentioned it to her two to three months later. On August 9 and September 2, 2014, Smuskiewicz interviewed Goble, who never requested immunity from prosecution. On September 10, 2014, Smuskiewicz interviewed Munch.

¶ 29    The State called Sias, who testified that he had a prior conviction for possession of cocaine. Sias stated that he agreed to testify in exchange for a pending charge of possession of a controlled substance with intent to deliver being reduced to simple possession. Consequently, he was convicted of possession of cocaine and heroin and sentenced to probation in August 2018. Sias

identified the cooperation agreement, which is included in the record on appeal, and stated that he was promised no other benefits.

¶ 30    Prior to January 2017, Sias knew that defendant was in Cook County jail "on a murder case," but did not know anything about the victim. On January 4, 2017, defendant called Sias from jail and stated that he would swallow metal and injure himself in order to be taken to Stroger. Defendant asked Sias to deliver a package to him at the hospital. The next day, Ellis called Sias and informed him that defendant was next to him in the hospital and Sias could bring the package. Sias "put the package together" and went to the hospital, where he saw defendant in a bed by Ellis. Sias passed defendant the package, and defendant said that "the girl got what she had coming and they will never convict him of it." Approximately two days later, defendant called Sias again and they spoke on the phone.

¶ 31    Sias identified recordings of his two phone calls with defendant. Defense counsel renewed his pretrial objection to the publication of the calls, and the court overruled the objection. The State published the two recordings and Sias identified his and defendant's voices.

¶ 32    In the first recording, defendant asks Sias to deliver items to him at Stroger in exchange for payment. Defendant tells Sias that he was "about to bust [his] f*** head open and swallow a bunch of metal s*** to go to Stroger." Defendant says that prison staff would "have" to send him to Stroger and he would "probably" be in the trauma unit the following day. Defendant also informs Sias that he planned to send Sias a letter about "a bigger plan" that was "too much" to discuss over the phone in detail. Defendant informed Sias he would give Sias "a G" for the task.

¶ 33    In the second recording, defendant and Sias primarily discuss their meeting. Defendant asks Sias about "the loot," states that what he did was not "easy," and adds that he "got lucky being placed next to that m***f***." Defendant also says, "when I say something, I'm for real."

¶ 34     On cross-examination, Sias stated the packages contained tobacco and heroin. Sias was subsequently arrested for bringing the contraband into Stroger, and his agreement with the State related to those charges. In Sias's phone conversations with defendant, they never discussed the incident at Public Storage or the woman who was killed.

¶ 35     Defendant entered a stipulation that Lindich would testify that he and Detective Nogajewski Mirandized and interviewed Goble on February 11, 2004.[3] Goble denied knowing about the homicide at Public Storage, and the officers informed him that "they had spoken to several of his friends and they had stated it was a good possibility" that he or defendant had committed the homicide. Goble replied that he "knew nothing about it."

¶ 36     In closing, defense counsel argued that the State presented no physical evidence and the witnesses were not credible. Defense counsel expressly advised that he did not seek to admit Munch's grand jury testimony into evidence, but sought to admit the rest of defendant's exhibits.[4]

¶ 37     The court found defendant guilty of counts I and II and not guilty of count III. In ruling, the court found Bahr and Munch to be very credible in their testimony and courtroom demeanor. The court also commented that Goble, Munch, and Sias were criminals, and that the court exercised "sufficient caution" in determining how their testimonies "may have been discredited." Nevertheless, the State presented evidence placing defendant at the scene with blood on his clothing, and incriminating himself as the person who killed Boyd.

¶ 38     Defense counsel filed posttrial motions, including a motion for acquittal, arguing that the State failed to prove that defendant killed Boyd and the testimonies of Goble, Munch, Sias, and

_____

[3] Detective Nogajewski's first name does not appear in the record on appeal.

[4] Although defense counsel stated that he did not seek to admit Munch's grand jury testimony into evidence, a transcript of that testimony was included in the trial court's impounding order and appears in the record on appeal.

Bahr were impeached, biased, and suspicious. Defense counsel also filed a motion for a new trial, arguing, *inter alia*, that the court erred in allowing into evidence the content of telephone conversations between Sias and defendant.

¶ 39    Prior to argument on the motions, defendant filed a *pro se* motion alleging defense counsel's ineffectiveness for failing to investigate certain exonerating evidence or impeach Bahr with certain points. In court, defendant further alleged that defense counsel failed to investigate matters favorable to his defense, and failed to use evidence in the record to impeach Bahr, Munch, Goble, and Sias.[5]

¶ 40    The court queried defendant and defense counsel about defendant's allegations. Defense counsel responded that he discussed defendant's concerns with him, and counsel's choices about which evidence to present and how to cross-examine the witnesses were strategic. The court denied defendant's motion for ineffective assistance, finding that his allegations involved trial strategy or were belied by the record. The court also denied the motions for acquittal and new trial.

¶ 41    After a hearing, the court sentenced defendant to two concurrent terms of 45 years' imprisonment. The court denied defendant's motion to reconsider sentence.

¶ 42    On appeal, defendant argues that the trial court abused its discretion in admitting evidence of his other bad acts, specifically, that defendant told Sias that he planned to "manipulate jail staff" to transport him to the hospital where Sias delivered a package to him and that he wanted to do something else in the future. Defendant posits that the State used this evidence that he purposely

---

[5] Defendant's *pro se* motion appears to refer to exhibits in connection with its discussion of Bahr's grand jury testimony, but the copy contained in the record on appeal does not include any attachments. Defendant also presented an "addendum" to his *pro se* motion addressing inconsistencies in the grand jury and trial testimonies. This addendum was discussed during the court's inquiry, but is not included in the record on appeal.

injured himself to get out of jail and obtain contraband, and planned future acts, to portray him "as a bad person with a bad character who must be convicted," and it was substantially more prejudicial than probative.

¶ 43 Evidence of a defendant's other crimes is admissible if relevant for any purpose other than to show his propensity to commit crimes. *People v. Wilson*, 214 Ill. 2d 127, 135 (2005). Such purposes include motive, intent, identity, and accident or absence of mistake. *People v. Dabbs*, 239 Ill. 2d 277, 283 (2010). "Even if offered for a permissible purpose, such evidence will not be admitted if its prejudicial effect substantially outweighs its probative value." *Id*. at 284. The admissibility of other crimes evidence is within the sound discretion of the trial court, and the court's decision will not be disturbed absent a clear abuse of discretion. *Wilson*, 214 Ill. 2d at 136.

¶ 44 "As a matter of jurisprudential policy, the rule expresses *** the concern that while 'evidence of bad character would not be irrelevant, *** *particularly in the setting of the jury trial*, the dangers of prejudice, confusion and time-consumption outweigh the probative value.' " (emphasis added) *Dabbs*, 239 Ill. 2d at 284 (quoting K. Broun, McCormick on Evidence § 190, at 752-53 (6th ed. 2006)). A trial judge is presumed to understand the law and correctly apply it. *People v. Felton*, 2019 IL App (3d) 150595, ¶ 48. In a bench trial, we presume the trial court considered the other crimes evidence only for the limited purpose for which it was introduced. *People v. Nash*, 2013 IL App (1st) 113366, ¶ 24.

¶ 45 Here, the State offered the phone calls between Sias and defendant for the limited purpose of establishing context for defendant's statement to Sias that "[t]hat girl got what she had coming to her. They will never be able to convict me." The court ruled that the evidence of the narcotics transaction was inadmissible, but the State could introduce evidence regarding "the statement and *** the phone conversation between Mr. Sias and the defendant." At trial, the phone conversations

between defendant and Sias were published over defendant's objection and admitted into evidence. Defense counsel challenged the admitted evidence in his motion for a new trial.

¶ 46    Defendant claims that the court abused its discretion in admitting evidence regarding his plan to injure himself in order to be taken to the hospital and receive a package from Sias, which was irrelevant to whether defendant killed Boyd in 2002. Initially, we note that the trial court exercised its discretion in determining that the statements relating to narcotics in the package were inadmissible, and, at trial, Sias's testimony regarding the content of the package was adduced by defense counsel rather than by the State.

¶ 47    To the extent that the statements related to defendant's plan to injure himself in order to be admitted to the hospital so that Sias could bring him a package and to the fact that defendant had an unspecified "bigger" future plan reflect other crimes evidence, however, the record belies defendant's claims that this evidence was more prejudicial than probative. The State introduced the evidence as context for how defendant came to make his inculpatory statement to Sias. Crucially, the court repeatedly commented that it would not consider the evidence for any purpose other than establishing the meeting between defendant and Sias.

¶ 48    Defendant's claims that the evidence was used to show he was a "bad person" are speculative. Absent evidence to the contrary, we must presume the trial court considered the evidence for the limited purpose for which it was introduced. See *Nash*, 2013 IL App (1st) 113366, ¶ 24; *People v. Naylor*, 229 Ill. 2d 584, 603-04 (2008) (the presumption that the trial court considered only competent evidence in reaching its finding may be rebutted where the record affirmatively shows the contrary). Thus, the court did not abuse its discretion in admitting the recordings of the phone calls between defendant and Sias.

¶ 49    Defendant also contends that defense counsel was ineffective for failing to impeach Munch with an excerpt from her grand jury testimony that was not introduced at trial, specifically, that she saw Goble walk with Boyd to the storage lockers but did not recall seeing defendant. Defendant also contends that defense counsel failed to offer the testimony as substantive evidence.

¶ 50    We review claims of ineffective assistance of counsel using the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Manning*, 241 Ill. 2d 319, 326 (2011). A defendant must demonstrate that (1) counsel's performance was objectively unreasonable under prevailing professional norms and (2) the deficient performance prejudiced defendant. *People v. Veach*, 2017 IL 120649, ¶ 30. A defendant must satisfy both prongs to establish ineffective assistance. *Id*. Our review is *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 21.

¶ 51    Generally, defendants must raise ineffective assistance claims on direct review if apparent on the record. *Veach*, 2017 IL 120649, ¶ 46. However, "[w]hen the four corners of the record is insufficient to address the issue of ineffective assistance of counsel, this court may decline to adjudicate the claim in a direct appeal in favor of addressing it in a proceeding for postconviction relief where matters outside the common law record can be considered." *People v. Winkfield*, 2015 IL App (1st) 130205, ¶ 28.

¶ 52    In this case, no part of Munch's grand jury testimony was entered into evidence during trial as defense counsel explicitly requested it not be admitted. Nor does the record show the grand jury testimony was attached to defendant's *pro se* posttrial motion alleging ineffective assistance. Notwithstanding that Munch's grand jury testimony was impounded and included in the record that was transmitted to this court, it is *de hors* the trial record and may not be considered for the first time in this direct appeal. See, *e.g.*, *People v. Sherrod*, 220 Ill. App. 3d 429, 436 (1991) ("statements made during a preliminary hearing, even if part of the record on appeal, may not be

considered if they were never made part of the trial record"); *People v. Bounds*, 36 Ill. App. 3d 330, 336 (1976) ("prior apparently inconsistent statements *** were never made a part of the trial record"; therefore, "[d]espite the fact that they are before us here as part of the record on appeal, we may not consider such statements since they are [d]e hors the trial record"). As defendant's claim regarding defense counsel's failure to impeach Munch relies on evidence outside the trial record, it is better suited for collateral proceedings and we decline to review it at this juncture. See *People v. Harris*, 2018 IL 121932, ¶ 48 ("claims of ineffective assistance of counsel are commonly raised in postconviction proceedings because they often require presentation of evidence not contained in the record").

¶ 53      Lastly, defendant argues, and the State concedes, that the trial court violated the one-act, one-crime rule in convicting him of two counts of first degree murder because both convictions were based on the same physical act of stabbing and killing Boyd.

¶ 54      Defendant recognizes that he did not raise his one-act, one-crime challenge before the trial court, forfeiting the claim. See *People v. Hillier*, 237 Ill. 2d 539, 544-45 (2010). However, defendant seeks review under the plain error doctrine, which allows a reviewing court to consider an unpreserved claim where a clear and obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) the error is so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 48. One-act, one-crime violations fall within the second prong of the plain error doctrine. *People v. Coats*, 2018 IL 121926, ¶ 10. Our first inquiry is whether a one-act, one-crime error occurred. *Id.* ¶ 11.

¶ 55      Under the one-act, one-crime rule, a defendant may not be convicted for multiple offenses based on the same physical act. *Id.* "Where but one person has been murdered, there can be but

one conviction of murder." *People v. Kuntu*, 196 Ill. 2d 105, 130 (2001). Whether a violation of the rule has occurred is a question of law that is reviewed *de novo*. *People v. Smith*, 2019 IL 123901, ¶ 15.

¶ 56    As defendant's two murder convictions were premised on the killing of a single person, Boyd, we agree with the parties that one of the convictions cannot stand. When multiple murder convictions have been entered on the same act, we must uphold only the conviction for the most culpable charge and the convictions for the less culpable charges must be vacated. *Kuntu*, 196 Ill. 2d at 130. The supreme court has established that intentional murder is a more serious offense than knowing murder and felony murder. *People v. Pitsonbarger*, 142 Ill. 2d 353, 378 (1990). Thus, we vacate defendant's conviction for knowing murder (count II) and affirm his conviction for intentional murder (count I).

¶ 57    Accordingly, we vacate defendant's conviction on count II and otherwise affirm the judgment of the circuit court.

¶ 58    Affirmed in part and vacated in part.