# Illinois Official Reports

## Appellate Court

---

### *People v. White*, 2020 IL App (1st) 171814

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANTRELL WHITE, Defendant-Appellant. |
| District & No. | First District, First Division<br>No. 1-17-1814 |
| Filed | March 31, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-712; the Hon. Steven G. Watkins, Judge, presiding. |
| Judgment | Reversed and vacated. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Tomas G. Gonzalez, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Annette Collins, Assistant State's Attorneys, of counsel, and Brett O'Connell, law student), for the People. |

Panel

JUSTICE WALKER delivered the judgment of the court, with opinion.
Presiding Justice Griffin and Justice Hyman concurred in the judgment and opinion.
Justice Hyman also specially concurred, with opinion.

**OPINION**

¶ 1    Defendant Dantrell White was charged with possession of a controlled substance, and he moved to quash arrest and suppress evidence. The circuit court denied the motion and subsequently convicted and sentenced him to two years' probation. Defendant argues that the circuit court erred in denying his motion. Specifically, he argues that the officers lacked a reasonable suspicion to conduct an investigatory stop or a lawful reason to frisk him, which led to the discovery of the controlled substance. For the following reasons, we reverse.

¶ 2                                  I. BACKGROUND

¶ 3    On December 8, 2012, defendant was arrested and charged with possession of less than 15 grams of morphine after Chicago police stopped and frisked him as he exited a CTA platform. Prior to trial, defense counsel filed a motion to quash arrest and suppress the evidence found in defendant's coat pocket, arguing that defendant was unlawfully stopped and frisked without reasonable suspicion of any criminal activity.

¶ 4    At the suppression hearing, the defense called Officer Timothy Kastler, a 10-year veteran of the Chicago Police Department. Officer Kastler testified that on December 8, 2012, at approximately 4:50 p.m., he and two other officers were on bike patrol in the vicinity of 1944 S. Kedzie Avenue. The officers' clothing and bike equipment made them readily identifiable as police officers. The officers were traveling northbound on Kedzie Avenue as they passed under the CTA Pink Line Station platform located at 1944 S. Kedzie Avenue. Officer Kastler estimated the platform was about 20 feet above ground. After he was about 15 feet past the platform, Officer Kastler heard an individual yell, "F*** you, motherf***." Officer Kastler did not know who yelled the profanity or to whom it was directed, but when he looked up toward the platform, he saw defendant and his friend, Dontae Avery, staring at him. Defendant then spat over the platform in the officers' direction. The spit did not strike Officer Kastler, nor did he feel threatened by it.

¶ 5    Officer Kastler and his partners then immediately proceeded to stand at the station entrances. While he stood at the entrance on the east side of the street, his partners were across the street at the west side entrance. Officer Kastler testified that he wanted to perform a field interview of the person spitting to "see what was going on." He waited a few minutes before defendant and Avery descended through the east side entranceway. Officer Kastler then asked the two to approach and speak with him. Defendant and Avery did not immediately comply with Officer Kastler's request. Instead, defendant walked down the stairs with his hands in his pocket while ignoring Officer Kastler's request to speak. Officer Kastler then ordered defendant to remove his hands from his pockets multiple times.

¶ 6    When defendant eventually looked up, Officer Kastler ordered defendant and Avery to stand against a wall with their hands on the wall and backs to Officer Kastler. Officer Kastler

- 2 -

testified that he could not recall if defendant voluntarily removed his hands from his pockets or if they were forcibly removed. He then performed a protective pat-down of defendant. Officer Kastler testified that he was concerned that defendant might have had a weapon because of defendant's refusal to remove his hands from his pockets. He further testified that defendant held his hands in his pockets for five to eight seconds after the initial request to remove them. However, Officer Kastler testified that he did not see any object protruding from defendant's pockets or any bulges in his clothing consistent with a weapon and that he did not see defendant commit a crime.

¶ 7        As Officer Kastler patted down the outside of defendant's coat pocket, he felt a hard, round object. He claimed that the object "felt like it could have been the barrel of a gun." He then removed the item from defendant's coat pocket and found an unlabeled orange plastic prescription bottle. According to Officer Kastler, defendant immediately volunteered that the bottle contained "only morphine." The bottle contained one small plastic bag, containing 13 loose purple pills and 13 individually wrapped purple pills, for a total of 26 pills. Officer Kastler placed defendant in custody after his admission. Prior to trial, defendant filed a motion to quash arrest and suppress evidence, and at the close of the hearing, the court denied defendant's motion.

¶ 8        Subsequently, the court denied defendant's motion to reconsider. The court found that defendant's act of spitting at the officers was an assault, and the assault gave Officer Kastler a reasonable articulable suspicion of criminal activity to approach and question defendant. When defendant refused to remove his hands after repeated requests, the court found it reasonable for Officer Kastler to believe that defendant was possibly armed and to perform a protective pat-down. After the pat-down revealed a pill bottle that defendant admitted contained morphine, Officer Kastler then had probable cause to arrest. Consequently, the court found that Officer Kastler's actions were appropriate, and the motion to quash and suppress was properly denied.

¶ 9        Officer Kastler was the only witness at defendant's bench trial. His testimony was consistent with his testimony at the suppression hearing. At trial, the parties stipulated that tests were performed on 1 of the 26 tablets recovered, and the chemist's expert opinion within a reasonable degree of scientific certainty is that the tested item was positive for the presence of morphine weighing .1 grams. The chemist would further testify that the total estimated weight of the 26 tablets was 0.4 grams.

¶ 10        The circuit court found defendant guilty of possession of a controlled substance and sentenced him to two years' probation. This timely appeal followed.

¶ 11                              II. ANALYSIS

¶ 12        On appeal, defendant contends that the trial court erred in denying his motion to quash arrest and suppress evidence because Officer Kastler did not see defendant commit a crime or observe a bulge in defendant's clothing consistent with a weapon. Defendant argues that Officer Kastler lacked a reasonable, articulable suspicion of criminal activity for an investigative stop or the protective pat-down.

¶ 13        When reviewing a trial court's ruling on motions to quash arrest and suppress evidence, this court applies a two-part standard of review. *People v. Leudemann*, 222 Ill. 2d 530, 542 (2006). The trial court's findings of fact are entitled to great deference and will be reversed only if they are against the manifest weight of the evidence. *People v. Hopkins*, 235 Ill. 2d 453,

471 (2009). However, the ultimate legal ruling as to whether suppression was warranted is reviewed *de novo*. *People v. Cosby*, 231 Ill. 2d 262, 271 (2008).

¶ 14    The fourth amendment to the United States Constitution prohibits unreasonable searches and seizures. U.S. Const., amend. IV; *Terry v. Ohio*, 392 U.S. 1, 8 (1968). The purpose of the fourth amendment is not to eliminate all contact between the police and citizens, but " 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' " *United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976)). Courts have the responsibility to guard against police conduct that is overbearing or harassing. *Terry*, 392 U.S. at 12-13. Police-citizen encounters are divided into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, also known as *Terry* stops, which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) (consensual) encounters that involve no coercion or detention and, thus, do not implicate fourth amendment interests. *Leudemann*, 222 Ill. 2d at 554.

¶ 15    The trial court found Officer Kastler had probable cause to arrest after defendant spat at the officers. However, the state does not argue, nor did Officer Kastler ever testify, that he intended to arrest defendant after this action. When Officer Kastler approached defendant, his intent was only to conduct a field interview to "see what was going on." This court recognizes a police "field interview" to be a *Terry* stop. *People v. Jackson*, 2012 IL (1st) 103300; *People v. Love*, 199 Ill. 2d 269, 272 (2002). Therefore, the issue here is determining whether Officer Kastler had reasonable suspicion of criminal activity at the inception of the *Terry* stop.

¶ 16    The fourth amendment protects against unreasonable searches and seizures by generally requiring a warrant supported by probable cause. *People v. Johnson*, 237 Ill. 2d 81, 89 (2010). A *Terry* stop, however, is a recognized limited exception to the warrant requirement. *Id.* The United States Supreme Court held, "where a police officer observes unusual conduct which lead him reasonably to conclude in light of his experience that criminal activity may be afoot," that officer may briefly stop the suspicious person and make reasonable inquires aimed at confirming or dispelling his suspicions. *Terry*, 392 U.S. at 30. Mere hunches and unparticularized suspicions are insufficient to justify the stop. *People v. Baldwin*, 388 Ill. App. 3d 1028, 1035 (2009). The stop must be supported by articulable facts constituting reasonable suspicion of criminal activity at its inception. *People v. Thomas*, 198 Ill. 2d 103, 109 (2001).

¶ 17    Defendant argues that Officer Kastler lacked a reasonable, articulable suspicion of criminal activity to justify the *Terry* stop. Defendant emphasizes Officer Kastler's testimony that he did not see defendant commit a crime or observe a bulge consistent with a weapon as evidence of his lack of reasonable suspicion. Defendant then suggests that his noncompliance with Officer Kastler's demands was the true reason for the stop.

¶ 18    We find that Officer Kastler indeed lacked reasonable, articulable suspicion of criminal activity when he stopped defendant. The circuit court held that defendant's spitting was a *possible* assault. However, Officer Kastler testified that he did not witness defendant commit *any* crime or reasonably believe defendant was about to commit a crime. Nor did Officer Kastler see any object protruding from defendant's pockets or any bulges in his clothing consistent with a weapon before the *Terry* stop. The *Terry* stop is analyzed through the perspective of the officer at the time of the stop, not in hindsight. *People v. Thompson*, 337 Ill. App. 3d 849, 863 (2003). Since Officer Kastler testified that he did not witness defendant

- 4 -

commit a crime, the circuit court's finding of a crime is against the manifest weight of the evidence.

¶ 19 The State, however, argues that three facts support Officer Kastler's reasonable, articulable suspicion of criminal activity. First, Officer Kastler heard an individual yelling profanity as he and fellow officers rode their bikes past the CTA platform. Second, Officer Kastler turned to look towards the source of the yelling and saw defendant. Finally, defendant spat in Officer Kastler's direction. However, these three facts are insufficient to demonstrate a reasonable, articulable suspicion of criminal activity. Officer Kastler testified that he did not know who yelled the profanity or if it was directed toward the officers. However, even if defendant yelled the profanity, and it was directed at the officers, that would not be a crime. Then, Officer Kastler saw defendant staring at him when he turned toward the yelling. However, it is also not a crime to stare at a police officer. Finally, defendant spat in Officer Kastler's direction, which Officer Kastler testified he did not view as a crime. Officer Kastler wanted to conduct a field interview to "see what was going on." However, to "see what was going on" is a vague reason for a police officer to stop a citizen who has not committed a crime and who the officer has no articulable reason to believe is about to commit a crime. Therefore, the *Terry* stop was invalid at its inception.

¶ 20 Even if the *Terry* stop was valid, the ensuing frisk exceeded the bounds of *Terry*. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others, the officer may conduct a pat-down search or frisk to determine whether the person is carrying a weapon. *Terry*, 392 U.S. at 24. However, the right to frisk does not automatically flow from a valid *Terry* stop. *People v. Galvin*, 127 Ill. 2d 153, 165 (1989). The officer does not need to be absolutely certain that an individual is armed, but the belief that one is armed must be reasonable. *People v. Rivera*, 272 Ill. App. 3d 502, 505 (1995). Once a reasonable belief of danger arises, an officer may conduct a frisk limited to the minimum scope necessary to discover objects capable of being used as weapons. *Id.* The sole justification for the frisk is protection of the police and others in the vicinity and not to gather evidence. *People v. Flowers*, 179 Ill. 2d 257, 263 (1997). The validity of a frisk conducted during a valid *Terry* stop is assessed by an objective standard. *Id.* at 264. The question is whether a reasonable person in the circumstances would be warranted in the belief that his safety or that of others was in danger. *Id.*

¶ 21 Defendant argues that Officer Kastler lacked justification for the frisk because he did not see a bulge consistent with a weapon in defendant's clothing.

¶ 22 Here, Officer Kastler heard someone yell profanity as he rode past the CTA station. When he looked in the direction of the yelling, he saw defendant staring at him. Defendant then spat in Officer Kastler's direction. When Officer Kastler approached to question defendant about his behavior, defendant refused to engage in conversation or remove his hands from his pocket. At that point, Officer Kastler was faced with an individual walking toward him with covered hands. Given the totality of the circumstances and his experience, Officer Kastler may have been reasonable in his belief that defendant was possibly armed and dangerous to justify a protective pat-down.

¶ 23 When Officer Kastler pat down the defendant, he felt a hard, cylindrical object through defendant's pants. He testified that he believed this object could have been a barrel of a gun, so he pulled it out of the defendant's pocket. However, there is a moment unaccounted for in this testimony. Officer Kastler did not testify as to the moment between wrapping his hand

around the object inside the defendant's pocket and his subsequently pulling the object out of defendant's pocket. In that moment, if Officer Kastler determined the pill bottle was not a weapon, then *Minnesota v. Dickerson*, 508 U.S. 366 (1993), was implicated.

¶ 24 In *Dickerson*, defendant, while exiting an apartment building with a history of cocaine trafficking, spotted police officers and turned to walk in the opposite direction. *Id.* at 368. In response, the officers commanded defendant to stop and proceeded to frisk him. The officer did not discover any weapons but felt a lump in his pocket. The officer reached into defendant's pocket and manipulated the lump further to determine that it was likely contraband and confirmed that the lump was in fact a small bag of cocaine. Defendant was then charged with possession of a controlled substance. The Supreme Court held that a police officer may seize contraband when it is in plain sight, and "its incriminating character is immediately apparent." *Id.* at 375. The Court further held that instances in which an officer uses the sense of sight to discover illegal goods are analogous to those involving the sense of touch, thus recognizing the "plain feel" or "plain touch" exception to the fourth amendment's warrant requirement. *Id.* at 375-76.

¶ 25 However, the Court concluded that the police officer in *Dickerson* exceeded the boundaries outlined in *Terry*. *Id.* at 377. The officer was already aware that defendant's jacket pocket did not contain a weapon, when he detected the lump. Moreover, it was not immediately apparent to the officer that the lump was cocaine. The officer had to manipulate the object to determine its illegal character. Therefore, the seizure of the drugs was unconstitutional.

¶ 26 Here, it may have been reasonable for Officer Kastler to believe that a hard, cylindrical object felt through a layer of clothing may be a gun. However, the moment Officer Kastler's hand entered defendant's pocket and wrapped around the plastic pill bottle, a reasonable officer would have known it was not the metal barrel of a gun. A reasonable police officer who believes he is encountering a gun would take some caution in removing the object from an individual's pocket. He would not hastily pull it out for fear of an accidental discharge. No reasonable officer would feel a plastic pill bottle in his hand and continue to mistake it for a gun or dangerous weapon. See *State v. Saldarriaga*, 721 A.2d 841, 843 (R.I. 1998). It was unreasonable for Officer Kastler to continue the search once he discovered the pill bottle. Once it was obvious that the pill bottle was not a weapon, further search was not authorized by *Terry*. *Dickerson*, 508 U.S. at 379.

¶ 27 The only reason Officer Kastler should have removed the pill bottle from defendant's pocket was if its incriminating character was immediately apparent on plain-feel. However, Officer Kastler does testify to this belief. Therefore, when Officer Kastler felt the pill bottle and knew it was not a gun or contraband of incriminating character, he exceeded the scope of *Terry* when he continued to pull it out of defendant's pocket.

¶ 28                                                    III. CONCLUSION

¶ 29 For the foregoing reasons, we reverse the circuit court's order denying defendant's motion to quash arrest and suppress evidence. The evidence seized is suppressed. Since defendant could not have been convicted without the evidence, defendant's conviction for possession of a controlled substance is vacated.

¶ 30 Reversed and vacated.

¶ 31        JUSTICE HYMAN, specially concurring:

¶ 32        The lead opinion correctly finds no reasonable suspicion supporting the *Terry* stop—whenever it occurred—so I join it in full. I write separately because the State's arguments about the point of seizure highlight the fraught choices ordinary people must make when they encounter police.

¶ 33        A central dispute focuses on the moment at which officers seized White. This moment is crucial, as officers must be able to justify a seizure at its inception. *Terry v. Ohio*, 392 U.S. 1, 20 (1968). White asserts that officers seized him "when [they] surrounded the CTA train station and immediately ordered him to stop and take his hands out of his pockets." The State disagrees. According to the State, officers did not seize White "until the moment when Officer Kastler directed him to place his hands against the station wall, and [White], for the first time" complied. The legal questions relevant to this dispute are (i) whether officers showed sufficient authority so that a reasonable person in White's position would not have felt free to leave and (ii) whether White complied with that authority. See, *e.g.*, *California v. Hodari D.*, 499 U.S. 621, 629 (1991) (seizure accomplished when offices display sufficient show of authority and suspect complies with authority).

¶ 34        Because of divergent opinions on the issue, I am concerned about the legal effect of unambiguous orders like Officer Kastler's order for White to take his hands out of his pockets. Compare *People v. Qurash*, 2017 IL App (1st) 143412, ¶¶ 25-27 (finding "request" to "come here" not sufficient show of authority to amount to seizure), with *People v. Williams*, 2016 IL App (1st) 132615, ¶¶ 39-41 (finding officer's request to "come here" sufficient show of authority to amount to seizure).

¶ 35        For the purposes of this encounter, however, I am far more troubled by the State's argument about the import of White's behavior in the mere seconds between the order to take his hands out of his pockets and the next order to put his hands against the wall.

¶ 36        At the same time, the State argues Kastler's so-called "request" for White to take his hands out of his pockets was not enough show of authority to amount to a seizure—meaning White could have continued about his business—the State also argues that White's decision to ignore Kastler's request supports a reasonable suspicion to detain him. As the Third District neatly put it: "To hold that exercising the right to refuse to answer and going about one's business supplies the basis for reasonable suspicion creates a 'heads I win, tails you lose' situation for the State, with the fourth amendment as the loser." *People v. Smith*, 331 Ill. App. 3d 1049, 1054 (2002). Even assuming White was not seized until Kastler forced his hands against the wall, it would be manifestly unfair to use his right to decline an interaction with Kastler as part of the reasonable suspicion calculus. The State cannot have it both ways.

¶ 37        To make matters worse, cases have turned on the relative abruptness or speed with which a person decides to avoid the police. *E.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("headlong flight" enough); *People v. Timmsen*, 2016 IL 118181, ¶ 14 (U-turn 50 feet from a police roadblock enough); *People v. Smith*, 331 Ill. App. 3d 1049, 1054 (2002) (suspect "backing away from the officers and refusing to remove his hands from his pockets" was "consistent with his right" to avoid police). But see, *e.g.*, *In re D.L.*, 2017 IL App (1st) 171764, ¶¶ 28-29 (even headlong flight not enough for reasonable suspicion). The United States Supreme Court may have invented this distinction (see *Wardlow*, 528 U.S. at 124), but I find no mandate for it. Besides, it is unworkable. Expecting police and the people they encounter to make a distinction between walking away, jogging away, or running away imposes difficulty

in achieving one of the fourth amendment's core purposes—guiding the conduct of officers and the public. See *People v. Leighty*, 362 Ill. App. 3d 258, 261 (2005).

¶ 38 While academic for the purposes of Kastler's stop, because White was seized when Kastler told him to take his hands out of his pockets, I take exception to the State getting the benefit of White's refusal to comply with Kastler's orders as a factor in support of reasonable suspicion. White was fully within his right to ignore Kastler and continue about his business.