2023 IL App (1st) 151965-B
No. 1-15-1965
Opinion filed September 15, 2023

Sixth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12 CR 9135 |
| KORY MAXFIELD, | ) ) ) | The Honorable |
| Defendant-Appellant. | ) ) | Kenneth J. Wadas, Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice Pucinski concurred in the judgment and opinion.
Justice Coghlan specially concurred, with opinion.

**OPINION**

¶ 1    On a warm May evening, a police radio reports that, after seeing a firearm inside, an officer fired at a white van carrying two men involved in an armed robbery, and the offenders fled on foot. The report provides no other description of the offenders. From 25 to 40 feet away, a plain-clothes police officer spots Kory Maxfield, appearing sweaty, walking in an alley a few blocks from where the van stopped. The officer detains Maxfield and drives him to a showup. Do these facts justify a stop under *Terry v. Ohio*, 392 U.S. 1 (1968)?

¶ 2        The trial court decided the facts were sufficient to justify a *Terry* stop. After taking account of the totality of the circumstances, we reverse the denial of Maxfield's motion to quash arrest and suppress the identification and other evidence obtained, vacate the convictions for armed robbery and unlawful use of a weapon, and remand for a new trial. We do so because without any distinctive or individualized details, the officer lacked a reasonable, articulable suspicion to stop an individual who happened to be walking in a general area. As the Supreme Court recognized in *Terry*, a stop should not "be undertaken lightly." *Id.* at 17.

¶ 3                                    Background

¶ 4        Jason Coleman and Nelly Cabrera had parked on 85th Street and Wabash Avenue when two armed men approached their car and demanded money. Before escaping in a white van, the men stole cash, jewelry, and a cell phone. Coleman and Cabrera followed the van and soon flagged down a police car. The officers then searched the area and came on a white van stalled in traffic. When Officer Phillip Stratzante approached, the van pulled away, hitting cars. Someone in the van pointed a gun at Stratzante, who fired eight shots into the back of the van.

¶ 5        Minutes later, having heard a flash alert of shots fired by police, Officer Zachary Rubald saw Kory Maxfield walking out of an alley a few blocks away. Rubald testified that Maxfield was sweating, and when detained, Maxfield was "out of breath." Rubald patted down Maxfield for weapons before handcuffing him, placing him in a police car, and bringing him to a showup, where Coleman identified Maxfield as one of the men who robbed him. Maxfield was placed under arrest.

¶ 6        Before trial, Maxfield's attorney did not move to quash the arrest and suppress the identification or evidence. Maxfield was convicted of two counts of armed robbery and six counts of aggravated unlawful use of a weapon. The trial court sentenced Maxfield to 21 years of

imprisonment for the armed robberies and a concurrent 7-year term for aggravated unlawful use of a weapon.

¶ 7    On direct appeal, Maxfield argued ineffective assistance of counsel for failing to move to suppress Coleman's identification and quash the arrest. *People v. Maxfield*, 2017 IL App (1st) 151965-U. We found the record insufficient to rule on the ineffectiveness claim. The parties agreed that Maxfield's sentence on the aggravated unlawful use of a weapon was unconstitutional under *People v. Burns*, 2015 IL 117387. We vacated the aggravated unlawful use of weapon conviction and remanded it to the trial court for reinstatement and sentencing on the unlawful use of a weapon by felon count. *Maxfield*, 2017 IL App (1st) 151965-U, ¶¶ 7, 15-16.

¶ 8    Maxfield filed a petition for leave to appeal with our supreme court. In the exercise of its supervisory authority, the Illinois Supreme Court ordered this court to vacate its judgment and consider on direct appeal Maxfield's "claim that his trial counsel was ineffective for failing to move to suppress evidence and quash." *People v. Maxfield*, No. 123036 (Ill. Mar. 21, 2018) (supervisory order).

¶ 9    On August 7, 2018, while retaining jurisdiction of this appeal, we vacated the Rule 23 Order entered November 7, 2017, and remanded to the trial court to allow Maxfield to move to suppress evidence and quash arrest.

¶ 10                          Motion to Suppress

¶ 11    At the motion to suppress hearing, Chicago police officer Phillip Stratzante testified that on May 2, 2012, at about 10 p.m., he and his partner were driving east from 87th Street and State Street when a westbound car headed straight at them. His partner hit the air horn because it looked as if the car might hit them. The driver, Jason Coleman, yelled out the window that he and his passenger, Nelly Cabrera, had been robbed by a Black man with a gun. Stratzante did not clearly

remember if they said two Black men robbed them, but they said they were robbed by a man with a "big old silver handgun." Coleman said the men drove away in a white van.

¶ 12     The officers began looking for the white van, but soon Coleman and Cabrera sped ahead, pointing to a white van. The officers followed Coleman and Cabrera until they turned north on State Street. The officers attempted to stop the van, but it turned, striking some cars. Stratzante testified that, after noticing that the passenger held a silver handgun, he took seven or eight shots at the van as it pulled away. Stratzante's partner called headquarters to report that police had fired at the van.

¶ 13     As the officers made a turn on Wabash Avenue, they saw the van stopped, facing north in the middle of Wabash Avenue, doors open and no one inside. The open doors indicated to the officers that the occupants fled either east or west.

¶ 14     Stratzante did not have a physical description of the men or see their faces.

¶ 15     Stratzante recovered a gun in the van and stayed at the scene to wait for the evidence technicians. Stratzante never saw the suspects who were apprehended.

¶ 16     State's exhibit No. 1 is a recording of radio transmissions that began with an officer yelling, "Shots fired by the police." From that point, there are several exchanges between police and the dispatcher. The dispatcher asks for a physical description of the offenders and then repeats, "We don't have a description at this time." By the end of the recording, police officers had taken two suspects into custody. The recording lasts almost 4½ minutes.

¶ 17     Officer Zack Rubald testified that he and his partner were in plain clothes, patrolling in an unmarked car. Shortly before 10:25 p.m., Rubald heard the flash message of shots fired by police. Rubald saw Maxfield walking out of an alley, heading eastbound on Indiana Avenue. Maxfield stopped, and Rubald got out and approached Maxfield. Rubald patted him down and placed

handcuffs on him. Rubald was sure he spoke to Maxfield but did not recall what he said. Nor did Rubald remember whether his partner also got out of the car or whether the message contained a clothing, height, or weight description of the suspects. Maxfield was the second offender apprehended. Rubald did not witness the robbery or communicate with the officers who had initial contact with the van. Rubald brought Maxfield to Coleman and Cabrera a few blocks away for a showup. After Coleman identified Maxfield, Rubald searched him again, finding $230 cash and jewelry.

¶ 18      On cross-examination, Rubald testified that the radio message alerted him that the offenders fled eastbound on Indiana Avenue (Indiana Avenue is a north/south street). Rubald was on Indiana Avenue, two streets from Michigan Avenue. Rubald first saw Maxfield walking in the alley, heading eastbound alone. He was sweating. When he detained him, he patted Maxwell down for safety and noticed Maxfield was "out of breath."

¶ 19      The trial court denied the motion, finding that "both police officers testified credibly and truthfully" and that the radio transmission corroborated their testimony.

¶ 20                                   Analysis

¶ 21                              Standard of Review

¶ 22      A trial court's ruling on a motion to suppress evidence presents a mixed question of law and fact. *People v. Thomas*, 198 Ill. 2d 103, 108 (2001). We review a ruling on a motion to suppress under a bifurcated standard. *People v. Johnson*, 237 Ill. 2d 81, 88 (2010). Unless against the manifest weight of the evidence, the reviewing court upholds the trial court's factual findings and witness credibility determinations. *People v. Gherna*, 203 Ill. 2d 165, 175 (2003). We review *de novo* the ultimate question of whether suppression is appropriate under the totality of the facts. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004).

¶ 23                                    Motion to Suppress

¶ 24        Courts have divided fourth amendment (U.S. Const., amend. IV) encounters into three theoretical tiers: (i) arrests or detentions supported by probable cause, (ii) brief investigative detentions or *Terry* stops supported by a reasonable, articulable suspicion of criminal activity (more than a mere "hunch"), and (iii) consensual encounters that involve neither coercion nor detention and do not implicate the fourth amendment. *People v. McDonough*, 239 Ill. 2d 260, 268 (2010). The defendant bears the burden of proof at the hearing on a motion to suppress evidence. *People v. Gipson*, 203 Ill. 2d 298, 306 (2003). Should a defendant make a *prima facie* case of an illegal search or seizure, the burden shifts to the State to present counter-evidence. *Id* at 306-07. Still, the ultimate burden remains with the defendant. *Id* at 307.

¶ 25        Under *Terry*, a police officer may conduct a brief, investigatory stop, an exception to the fourth amendment, when the officer has a reasonable, articulable suspicion of criminal activity that embodies more than a mere "hunch." *Gherna*, 203 Ill. 2d at 177 (citing *Terry*, 392 U.S. at 27). While reasonable suspicion furnishes a less demanding standard than probable cause, the fourth amendment requires at least a minimal level of objective justification for making the stop. See *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

¶ 26        Maxfield seeks to suppress his identification because his stop did not meet that minimal level of objective justification. Maxfield contends that Rubald's stop involved an "inchoate and unparticularized suspicion or hunch" of criminal activity. See *Terry*, 392 U.S. at 27. Maxfield asserts that Rubald had no physical or clothing description and he was not engaged in any suspicious behavior.

¶ 27        After sighting Maxfield, Rubald detained, handcuffed, placed him in his police car, and took him to a "showup," where one of the victims identified him. Maxfield was then arrested and

searched. Maxfield argues that the identification and the cash and jewelry found on him were "obtained by exploitation of the illegal arrest" and " ' "by means sufficiently distinguishable to be purged of the primary taint" '," citing *People v. Morris*, 209 Ill. 2d 137, 157 (2004), which also quoted and cited *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

¶ 28                                        Reasonable Suspicion for the Stop

¶ 29        The State contends that Rubald had a reasonable, articulable suspicion that Maxfield was involved in the robbery because he knew that (i) two Black men had committed a robbery, (ii) an officer fired shots at the van in which the suspects fled, (iii) the van stopped, (iv) its doors were left open and proceeds from the robbery were recovered from the van and Maxfield, (v) Maxfield was the only person in the general area where the suspects were known to have fled, and (vi) Maxfield was sweating and out of breath.

¶ 30        But both the radio transmission and Rubald's testimony establish that Rubald knew that two male suspects (race was not broadcast) had been involved in an armed robbery, and police had fired shots at a white van after which the suspects got away and fled on foot. Rubald had no descriptions of the suspects' clothing, height, weight, or other physical characteristics. The dispatcher stated, "We don't have a description at this time." Even police testimony that a defendant fits the description of a suspect is not enough to conduct a stop unless the suspect attempts to flee. *People v. Washington*, 269 Ill. App. 3d 862, 866 (1995). In *Washington*, we concluded that the State presented no evidence of a description or how the defendant matched it to support the officers' conclusion. *Id.* at 866-67.

¶ 31        A stop must be supported by articulable facts constituting reasonable suspicion of criminal activity "*at its inception*." (Emphasis added.) *Thomas*, 198 Ill. 2d at 109. An example of inadequate facts is *United States v. O'Neal*, 17 F.3d 239, 240-41 (8th Cir. 1994). In *O'Neal*, the defendant and

his brother got off a bus in Minneapolis that originated in Chicago, which was known as a " 'source city' " for drugs. *Id.* at 240. Minneapolis police and county sheriffs, monitoring the bus depot for possible drug couriers, saw the defendant, a Black male wearing a Chicago Bulls starter jacket, walk " 'briskly' " with his brother to a parking lot rather than into the bus terminal. *Id.* They both had " 'athletic-type' " bags and " 'stared' " at one of the officers, who thought the defendant looked apprehensive. *Id.* The officers approached the defendant and his brother and told them that they were not under arrest but that they wanted to ask a few questions. *Id.* at 240-41. Two officers noticed the defendant was " 'sweating profusely' " and appeared nervous. *Id.* at 241. The officers stated they were narcotics agents and asked to search the defendant's bag. In response, the defendant demanded a search warrant. *Id.* The agents seized the bag, later found to contain narcotics. *Id.*

¶ 32      On appeal from the denial of a motion to suppress, the reviewing court found the seizure was illegal because "there [was] a compelling lack of any evidence that might be said to engender reasonable, articulable suspicion." *Id.* Here, Maxfield's behavior could hardly be described as suspicious. Rubald saw Maxfield walking from the alley (as opposed to either running or walking quickly). Maxfield was not doing anything unusual or unlawful that would lead Rubald to think he had committed—or was about to commit—a crime. And when Rubald approached Maxfield, he stopped and cooperated.

¶ 33      By his own admission, Rubald stopped Maxwell only because he was sweating. We take judicial notice that the temperature on May 2 at 9:51 p.m. was 71 degrees with 71% humidity. (*Past Weather in Chicago*, Illinois, USA-May 2012, Timeanddate, https://www.timeanddate.com/weather/usa/chicago/historic?month=5&year=2012 (last visited Aug. 29, 2023) [https://perma.cc/8N2D-5ZWD]) Sweating, even profusely, alone is not enough to support a reasonable suspicion,

considering common knowledge that sweating can be caused by several factors, among them high temperatures, illness, medications, diet, exercise, and humidity.

¶ 34    We find further guidance in cases where no reasonable suspicion was found. See, *e.g.*, *People v. White*, 2020 IL App (1st) 171814, ¶¶ 18-19 (no reasonable suspicion where defendant may have yelled profanity and spat toward officer); *People v. Williams*, 2016 IL App (1st) 132615, ¶ 47 (defendant's "mere presence in the high-crime area, standing alone, was not sufficient" to support reasonable suspicion); *In re Rafeal E.*, 2014 IL App (1st) 133027, ¶¶ 28-29 (defendant's walking away from group of five or six individuals not "evasive behavior"); *People v. Kipfer*, 356 Ill. App. 3d 132, 134 (2005) (defendant's walking away from parked police car in parking lot did not support reasonable suspicion); *People v. F.J.*, 315 Ill. App. 3d 1053, 1058-59 (2000) (no reasonable suspicion where officer saw defendant, standing at entrance of alley, put unknown object in his pocket).

¶ 35    We hold that these facts taken together do not rise to create a reasonable suspicion that Maxfield was involved in criminal activity under *Terry* and its progeny. Presence in an area is not necessarily suspicious on its own, especially considering a warm May evening at 10:30 p.m., when people would be expected to be outside.

¶ 36                              Collective Knowledge Doctrine

¶ 37    The State, citing *People v. Ewing*, 377 Ill. App. 3d 585 (2007), argues that the application of the collective knowledge doctrine provided the police with a reasonable suspicion that defendant had been involved in the robbery. Under the doctrine, information known to police officers acting in concert can be examined when determining whether the officer initiating the stop had reasonable suspicion. *Id.* at 593. Nevertheless, "if the officer initiating the stop relies on a dispatch [(as here)],

the officer who directed the dispatch must have possessed sufficient facts to establish probable cause to make the arrest." *Id.* at 594.

¶ 38    As to the collective knowledge on Rubald's part, Stratzante testified that Coleman and Cabrera said two men in a white van robbed them and they pointed out the van, which Stratzante and his partner followed until it stopped. Stratzante approached, saw the passenger had a gun, and fired seven or eight times into the van, which pulled away. Stratzante and his partner gave chase, losing sight of the van for a few minutes. Turning on Wabash Avenue, they came across the van, empty and abandoned in the middle of the street.

¶ 39    Stratzante saw a "male Black" and thought the passenger might have been wearing dark clothes, but he never saw the passenger's face. (Rubald testified that he "believed [Maxwell] had a white T-shirt on.") The open doors on the north-facing van were on the east and west sides, so that the occupants might have run either east or west.

¶ 40    The collective knowledge doctrine adds nothing that would legitimize the illegal *Terry* stop. Like Rubald, Stratzante had no physical description, and his description of clothing, which was not broadcast, conflicted with Rubald's.

¶ 41                    Suppression of Evidence After Arrest

¶ 42    Generally, evidence directly obtained through a presumptively unreasonable search or seizure must be excluded from trial. *People v. Lockett*, 2022 IL App (1st) 190716, ¶ 19 (evidence obtained by exploiting fourth amendment violation " 'is subject to suppression as the "fruit" of that poisonous tree' "). Because Rubald conducted the custodial search after the invalid *Terry* stop, the evidence should have been suppressed as the "fruit of the poisonous tree."

¶ 43     Rubald detained Maxfield and conducted a protective frisk for weapons. Rubald found none, but handcuffed Maxfield and transported him to the "showup." After Coleman identified Maxfield, Rubald searched Maxfield, finding cash and jewelry.

¶ 44     Reversed in part and vacated in part; cause remanded for a new trial in conformity with this opinion.

¶ 45     JUSTICE COGHLAN, specially concurring:

¶ 46     The question in this case is whether Officer Rubald possessed the reasonable, articulable suspicion to conduct a brief investigatory stop of Maxfield. I agree with the result reached by the majority but disagree with the majority's reasoning in reaching its decision.

¶ 47     Under the " 'collective- or imputed-knowledge' " doctrine, "[t]he focus is on whether the officer on whose instructions or information the actual searching or arresting officers relied had reasonable suspicion to search or probable cause to arrest." *People v. Ewing*, 377 Ill. App. 3d 585, 593 (2007). In the context of probable cause, we have held that "an arresting officer may rely upon a dispatch to make an arrest *even if he is unaware of the specific facts that established probable cause to make the arrest*" (emphasis added), as long as the officer who directed the dispatch possessed facts sufficient to establish probable cause. *People v. Crane*, 244 Ill. App. 3d 721, 724-25 (1993).

¶ 48     Here, the evidence established that a reported armed robbery occurred near 87th Street and State Street, the suspects were driving a white van, and they attempted to flee from the scene in the van. Officer Stratzante spoke to the victims and learned that the suspects were two Black men. Stratzante saw the van, approximately two or three blocks away, and observed a "male Black" pointing a firearm from the passenger seat. Stratzante fired gunshots at the van as it continued to flee. Police officers soon found the van unoccupied and stopped on Wabash Avenue. The front

doors of the van were open in the east and west direction, and proceeds from the robbery were found nearby. Rubald heard a flash message, indicating that the suspects were fleeing east or west from the 8600 block of Michigan Avenue. "[A] couple of minutes" after the flash message, Rubald encountered Maxfield coming out of an alley walking east, approximately two blocks east of where the abandoned van was found. Rubald noticed that Maxfield was sweating profusely and out of breath.

¶ 49        In this case, under the "collective- or imputed-knowledge" doctrine, the totality of these circumstances was insufficient to provide the reasonable, articulable suspicion to stop Maxfield and detain him for further investigation.

*People v. Maxfield*, 2023 IL App (1st) 151965-C

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 12-CR-9135; the Hon. Kenneth J. Wadas, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Erin Sostock, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Joseph Alexander, and Gina DiVito, Assistant State's Attorneys, of counsel), for the People. |