2024 IL App (1st) 231387-U

FOURTH DIVISION
Order filed: October 17, 2024

No. 1-23-1387

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 11993 |
| | ) | |
| | ) | Honorable |
| DEONTE FRAZIER, | ) | James B. Linn, |
| | ) | Jennifer Coleman, |
| Defendant-Appellant. | ) | Judges, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Rochford concurs in the judgment.
Justice Ocasio dissents in the judgment.

**ORDER**

¶ 1     *Held*:  The *Terry* stop and subsequent pat-down of the defendant were warranted when the defendant was in a high-crime area, repositioned an item in his waistband in a manner consistent with the adjustment of a firearm, and acted nervously when approached by police. The circuit court also did not err in sentencing the defendant to a middle-of-the-range sentence when the court acknowledged the defendant's mitigation arguments and instead placed greater weight on his lengthy criminal history.

¶ 2    The defendant, Deonte Frazier, appeals his conviction of one count of unlawful possession of a weapon by a felon, which resulted from a *Terry* stop and a subsequent pat-down. He contends that the circuit court erred in denying a pretrial motion to suppress and in sentencing him to 8 years in prison without sufficiently considering certain mitigating factors. We see no merit to his arguments and affirm.

¶ 3    On September 20, 2022, the defendant, who was out on bond from a charge of unlawful use of a weapon by a felon in case 21CR10866, was at a gas station in Chicago when he was approached by two police officers. Believing that he was carrying a concealed weapon, the officers patted down the defendant and found a firearm. The defendant was then arrested and ultimately charged with one count of unlawful possession of a weapon by a felon and two counts of aggravated unlawful use of a weapon. The defendant moved to suppress the officers' recovery of the weapon, arguing in the motion that the police had no reason to believe that he was armed.

¶ 4    At the hearing on the defendant's motion to suppress, Officer Demetrius Prothro testified that on September 20, 2022, he and his partner, Officer Carl Smith, were on patrol on the east side of District Six in an unmarked police vehicle. Both officers were wearing plain clothes with tactical vests identifying them as police, as well as utility belts containing firearms and handcuffs. The officers initially saw the defendant getting out of his vehicle at a gas station, which Prothro described as "an area of heavy attention based off of that district." As the defendant was exiting the vehicle, Prothro "observed him reposition an item from his right rear waistband area." Prothro testified that he had observed similar movements hundreds of times before, and he estimated that ninety percent of the time he later found contraband in that area. The officers parked their car and followed the defendant inside "to conduct a field investigation or at least have a conversation [with

the defendant] at that moment." Inside the store, they found the defendant at the register with an unlit cigar of suspected cannabis hanging from his mouth. According to Prothro, the defendant was breathing heavily and had wide eyes.

¶ 5    Prothro testified that, "due to characteristics, the furtive movement, along with the area that we were," he asked the defendant if he had any alcohol, drugs, or weapons on him, after which the defendant, in Prothro's words, "looked down, paused, and related to me, not verbatim, 'No.'" Without asking consent, Prothro then patted down the defendant and found a loaded firearm on the defendant's waist. A subsequent records search revealed that the defendant did not have a Firearm Owner's Identification (FOID) card or a Concealed Carry License (CCL), and as a result, the defendant was arrested. Prothro admitted that at the time of the search he was not aware of any active warrants or investigatory alerts related to the defendant. A recording of the encounter from Prothro's body-worn camera was then played for the court.

¶ 6    Following Prothro's testimony, the court gave an oral ruling denying the defendant's motion to suppress:

> "The Court heard the witness testify and I saw the video which corroborated basically everything that you said. The officer is on patrol. It's a high crime area where he's always got to be alert for things. He sees [the defendant] acting in a manner which drew his attention and raised some suspicions moving objects around in his waistband. He suspected there may be contraband there based on past experience and based on the area where he was.
>
> When inside he saw [the defendant] with what looked like marijuana in his mouth albeit not lit but a marijuana cigarette. Asked him if he had anything. [The defendant] didn't

look him in the eye and didn't give him a definitive answer. He just looked down and said no and appeared to be nervous. Apparently, the officer did the briefest of pat-downs. It wasn't like a full fledge search. It was a very brief pat-down right where this happened moments, less than a minute, after this encounter. Well less than a minute. Found exactly what he suspected might be there, which is a gun.

I'm not finding it supports the Fourth Amendment [*sic*] by this very brief encounter and the pat-down under the circumstances that it happened. The motion to suppress is respectfully denied."

¶ 7　The defendant moved for reconsideration of the denial of the motion to suppress, which the circuit court also denied. The case proceeded to a jury trial solely on the charge of unlawful possession of a weapon by a felon, following which the jury found the defendant guilty of that charge.

¶ 8　At the defendant's sentencing hearing, the parties agreed that the applicable sentencing range was 3 to 14 years in prison. The State argued that, as an aggravating factor, the defendant had a significant prior criminal history that included convictions for possession of a controlled substance; aggravated resisting an officer; aggravated battery; possession of cannabis with intent to sell or deliver; possession of a controlled substance; and unlawful use of a weapon by a felon. The State also noted that at the time of the offense at issue the defendant was out on bond on the unlawful-use-of-a-weapon charge in case 21CR10866, of which he was ultimately convicted. The State asked that the defendant's sentence in the present case run consecutively to his sentence in case 21CR10866.

¶ 9     The defendant informed the court that he was thirty-six years old and has a close and supportive relationship with both his mother and his seventeen-year-old daughter. Prior to his arrest in this case, he had been continuously employed as a delivery driver since 2010 and had also worked for a staffing company since 2016. He suffers from anxiety and depression, both of which he would like to treat, and he was not affiliated with any gang. During his time in custody, he had completed four separate school courses and almost fifty hours of coursework, as well as 6 days of self-improvement programs. The defendant asked for a minimum sentence to be served concurrently to his sentence in case 21CR10866. Defense counsel also seemed to ask for leniency on the basis that the defendant's prior counsel made numerous attempts to speak with the defendant's privately retained counsel from case 21CR10866 to work on a global disposition of both cases, but the private counsel was unresponsive, preventing a more favorable resolution of the defendant's cases. The defendant made a statement in which he suggested that the evidence did not tell the whole story, and he stated that he has a daughter who needs him and that all of the work that he does is for her.

¶ 10    The circuit court agreed with the State that two aggravating factors under section 5-5-3.2(a) of Unified Code of Corrections (Code) (730 ILCS 5/5-5-3.2(a) (West 2022)) were present, namely that the defendant has a history of prior criminal activity (see *id.* § 5-5-3.2(a)(3)) and that the defendant was out on bond on a felony charge and was later convicted of that charge (see *id.* § 5-5-3.2(a)(12)). The court noted that it found that defendant's aggravated battery conviction to be "most disturbing." The court also stated that, "I recognize that [defense] counsel has an argument that is very well placed in mitigation about the defendant's history. I will note though that he has been consistently arrested." The court further observed that the defendant had neither

caused nor threatened serious harm, a mitigating factor under section 5-5-3.1(a)(1) (730 ILCS 5/5-5-3.1(a)(1) (West 2022)). However, the court found that "there is far more aggravation than mitigation here given his background." The court ultimately imposed an 8-year sentence to be served consecutively to his sentence in case 21CR10866. Defense counsel made an oral motion to reconsider the sentence, but did not subsequently file a written motion to reconsider. This appeal follows.

¶ 11    The defendant raises two issues in this appeal. First, he challenges the circuit court's denial of his motion to suppress, arguing that the *Terry* stop and pat-down were unjustified. Second, he argues that the court failed to adequately consider mitigating factors during sentencing and that his sentence is excessive. We find both arguments to be without merit and will address each in turn.

¶ 12    The fourth amendment of the United States Constitution generally requires that any government search or seizure be authorized by a warrant supported by probable cause. *People v. Love*, 199 Ill. 2d 269, 275 (2002). However, at issue in this case is the exception to that rule outlined in *Terry v. Ohio*, 392 U.S. 1 (1968). "Pursuant to *Terry,* a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to, commit a crime." *People v. Timmsen*, 2016 IL 118181, ¶ 9 (citing *Terry*, 392 U.S. at 22). "The officer must have a 'reasonable, articulable suspicion' that criminal activity is afoot." *Id.* (citing *Illinois v. Wardlow,* 528 U.S. 119 (2000)). "The investigatory stop must be justified at its inception and the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the governmental intrusion upon the constitutionally protected interests of the private citizen." *Id.* (citing *Terry*, 392 U.S. at 20-21). When evaluating the validity of a stop, we look at the totality of the circumstances

and objectively consider, " 'would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?' " *Id.* (quoting *Terry*, 392 U.S. at 21-22). Further, once an officer has initiated a stop, if the officer reasonably believes that the suspect "is armed and presently dangerous to the officer or others, the officer may conduct a pat down search or frisk to determine whether the person is carrying a weapon." *People v. White*, 2020 IL App (1st) 171814, ¶ 20 (citing *Terry*, 392 U.S. at 24). When reviewing the denial of a motion to suppress evidence, we "accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence; however, we will review *de novo* the ultimate question of the defendant's legal challenge to the denial of his motion to suppress." *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001) (citing *In re G.O.*, 191 Ill. 2d 37, 50 (2000)).

¶ 13    The defendant argues that Officers Prothro and Smith lacked reasonable suspicion to justify both the initial *Terry* stop and the resulting pat-down. In support, he cites caselaw holding that the sight of a bulge in a suspect's clothing is insufficient to justify a stop (see, *e.g.*, *People v. Goodum*, 356 Ill. App. 3d 1081, 1085 (2005)) and he further argues that, even if a firearm were visible, the stop still would not have been warranted because possessing a firearm is not necessarily a crime (see *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 40 ("[P]olice cannot simply assume a person who possesses a firearm outside the home is involved in criminal activity.")). He also contends that, once stopped, there was no evidence that he posed a danger to the officers so as to justify the pat-down. The State counters that the totality of the circumstances supported both the stop and the pat-down, as the defendant was in a high-crime area, repositioned an item in his waistline, and acted nervously and evasively when confronted by police. We agree with the State that, when

considering those three factors and the totality of the circumstances, both the initial *Terry* stop and the subsequent pat-down were justified.

¶ 14    First, we consider the location of the encounter, as "[a] person's presence in a high crime area is a relevant factor in deciding whether, under the totality of the circumstances, the police have reasonable suspicion to justify a *Terry* stop." *People v. Harris*, 2011 IL App (1st) 103382, ¶ 12. The circuit court in this case found that the stop occurred in a high-crime area, and that finding has support in the record. Indeed, Officer Prothro testified that the gas station in question was "an area of heavy attention based off of that district" and that the stop was motivated in part by "the area that they were [in]." Although the defendant challenges this characterization of the gas station as a high-crime area as conclusory, whether an area can be referred to as one of high crime is a factual issue (*id.* ¶ 13), and we defer to the circuit court's factual findings unless they are against the manifest weight of the evidence. On this issue, the defendant has not pointed to any evidence from the hearing on his motion to suppress countering or undermining the court's finding that the gas station in question was a high-crime area. Accordingly, we cannot say that the court's finding on that point was against the manifest weight of the evidence. See *People v. Jackson*, 2012 IL App (1st) 103300, ¶ 35 ("[A]n officer's uncontradicted and undisputed testimony, which is accepted by the trial court, is sufficient to support a trial court's finding that the incident occurred in a high-crime area." (citing *People v. Wardlow,* 183 Ill. 2d 306, 310-11 (1998))); see also *People v. Smith*, 2023 IL App (3d) 230060, ¶ 34 (noting that we will only disturb a court's factual findings in ruling on a motion to suppress "if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." (citing *People v. Deleon*, 227 Ill. 2d 322, 332 (2008))).

¶ 15 The second factor at issue is the defendant's conduct when getting out of his vehicle. The defendant argues that adjusting a bulge in his pants is insufficient to warrant a stop, and he cites several cases establishing the principle that "[a] single bulge in a defendant's clothing, by itself, does not justify a *Terry* stop and pat-down search." *Goodum*, 356 Ill. App. 3d at 1085. While that rule has indeed been well-established, Officer Prothro did not merely observe a bulge in the defendant's clothing. Rather, he testified that the defendant "reposition[ed] an item from his right rear waistband area." This is an important distinction because the repositioning or adjustment of item in the waistband area more strongly implies the presence of a weapon than does the sight of a simple bulge. See *United States v. Padilla*, 548 F.3d 179, 189 (2d Cir. 2008) (holding that "it was reasonable to infer that [the defendant] was carrying a gun in his waistband" when a detective observed the defendant "reach underneath his jacket and shirt and adjust a weighty object concealed at the center of his waistline"); see also *United States v. Rodriguez*, 727 Fed. Appx. 725, 727 (2d Cir. 2018) (holding that it was reasonable to infer the presence of a firearm when the defendant was "holding something against his midsection with his left hand" and then "moved his right hand so that both of his hands were against his midsection, as if to protect his waistband area"); *United States v. Oglesby,* 597 F.3d 891, 895 (7th Cir. 2010) (holding that an officer reasonably believed that a defendant who moved his hand toward his pocket was carrying a weapon because "experience has shown that a subject who pats his waistband may be trying to confirm that his gun is concealed and secured"). Based on Officer Prothro's description of the defendant's actions, we disagree with the defendant's application of bulge principles to the present case and instead believe that it was reasonable to infer the presence of a weapon from the defendant's adjustment of an item in his waistband.

¶ 16    The third relevant factor in this case is the defendant's nervousness and evasiveness. See *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion***."). While nervousness alone is not enough to create reasonable suspicion, "[n]ervousness is more salient to the reasonable determination calculus when it accompanies other suspicious behavior or circumstances suggesting a risk to officer safety." *United States v. Howell*, 958 F.3d 589, 600 (7th Cir. 2020). In this case, Officer Prothro testified that the defendant had wide eyes, was breathing heavily, and when asked by Prothro whether he was armed he looked down and hesitated before answering. These observations are relevant to the overall calculus.

¶ 17    When we view the totality of the circumstances, we agree with the circuit court that the police officers had reasonable suspicion to initiate the *Terry* stop and to pat down the defendant for a potential weapon. As we have discussed, the defendant was in a high-crime area, repositioned an item in his waistband in a manner consistent with the adjustment of a concealed weapon, and appeared nervous when confronted by police. Caselaw supports the conclusion that these facts together supplied reasonable suspicion justifying a *Terry* stop and a subsequent pat-down. See *Spears v. Leporace*, 449 Fed. Appx. 187, 190 (3d Cir. 2011) (holding that a *Terry* stop and pat-down were justified when, while in a bar in a high-crime area, the suspect arched his back, adjusted something in his waistband, and, when asked by police whether he had a firearm, acted nervously, looked away from the officer and toward the exit, and hesitated before answering); see also *United States v. Wallace*, 450 Fed. Appx. 175, 177 (3d Cir. 2011) ("[W]hen an officer observes suspicious behavior he reasonably believes is intended to conceal a weapon, he is justified in searching for

the weapon."). Accordingly, we affirm the circuit court's denial of the defendant's motion to suppress.

¶ 18    In his second issue, the defendant contests his 8-year sentence, arguing that the length of the sentence is excessive and demonstrates that the court failed to appropriately balance the goals of rehabilitation and retribution. "The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010) (citing *People v. Stacey*, 193 Ill. 2d 203, 209 (2000)). " 'The trial judge has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citations.] Consequently, the reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently. [Citation.]" *Id.* (quoting *Stacey,* 193 Ill. 2d at 209). For these reasons, when a defendant contends that his sentence is excessive, we review the court's decision for an abuse of discretion, which "occurs when the sentence differs greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 99 (citing *People v. Snyder*, 2011 IL 111382, ¶ 36).

¶ 19    We initially note that the defendant did not preserve this sentencing challenge by filing a written motion to reconsider his sentence. See *People v. Jackson*, 182 Ill. 2d 30, 69 (1998) ("As a general rule, the failure to object to an alleged error at sentencing and in a post-sentencing motion results in a waiver of that error on appeal."). However, waiver notwithstanding, we see no error in the circuit court's imposition of the defendant's sentence.

¶ 20    The defendant contends that the court failed to adequately consider the evidence in mitigation, as purportedly shown both by the court having only explicitly mentioned the fact that

he did not cause or threaten serious harm and by the court's statement that it was balancing that factor against his criminal history. However, "[t]he trial judge is not required to detail precisely for the record the exact process by which she determined the penalty nor is she required to articulate her consideration of mitigating factors nor is she required to make an express finding that defendant lacked rehabilitative potential." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002) (citing *People v. Redmond,* 265 Ill. App. 3d 292, 307 (1994)). Instead, we "presume[] that the trial court considered only appropriate factors in sentencing, unless the record affirmatively shows otherwise." *Id.* (citing *People v. Lurks,* 241 Ill. App. 3d 819, 827 (1993)).

¶ 21    The record of the sentencing proceeding belies the defendant's contention that the court failed to consider his evidence in mitigation, which, it is worth mentioning, was not overwhelming. To the contrary, during the sentencing hearing the court explicitly acknowledged the defendant's mitigation argument, stating, "I recognize that [defense] counsel has an argument that is very well placed in mitigation about the defendant's history." Rather, the record instead reflects that the court simply placed greater weight on the defendant's criminal history, with the court's next immediate comment being, "I will note though that he has been consistently arrested," and with the court later stating, "there is far more aggravation than mitigation here given his background." This weighing of the various sentencing factors was within the court's discretion (see *Alexander*, 239 Ill. 2d at 212), and the court was correct that the defendant's criminal history is extensive. Even though most of his convictions were for non-violent offenses, the fact remains that, as the court observed, the defendant has "consistently" been in trouble with the law, and he was out on bond at the time that he committed the offense at issue in this case. Given that history, we cannot say that the court

abused its discretion in sentencing the defendant to 8 years in prison, a term that is in the middle of the potential range of 3 to 14 years.

¶ 22   For the foregoing reasons, we affirm the defendant's conviction and sentence.

¶ 23   Affirmed.

¶ 24   JUSTICE OCASIO, dissenting:

¶ 25   For a police officer to force a person to submit to the temporary investigative seizure known as a *Terry* stop, he "must reasonably suspect that the person apprehended is committing or has committed a criminal offense." *People v. Lozano*, 2023 IL 128609, ¶ 35. Before the officers in this case stopped Deonte Frazier, all they knew was that, while getting out of his car to go into a gas station, he adjusted something at his waist that could have been a gun. (Of course, it could have been something else—A fashionable fanny pack? A colonoscopy bag?—but the *Terry* reasonable-suspicion standard does not require officers to rule out alternative explanations.) The sum of their knowledge was that he might be armed. That's it. Carrying a gun is not *ipso facto* against the law, so "police cannot simply assume a person who possess a firearm outside the home is involved in criminal activity." *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 40. If there was a basis for reasonably suspecting that Frazier was *illegally* possessing a gun, then an investigative stop would be justified. But there was nothing here suggesting illegal possession, and mere possession is not a sufficient justification.

¶ 26   How, then, does the majority conclude that the stop was justified? It gives two reasons.

¶ 27   The first is that Frazier "appeared nervous when confronted by police." After viewing the bodycam video, I would describe Frazier's demeanor as not only calm and composed but remarkably so given that that two police officers were surrounding him and putting hands on him.

Putting that aside, though, the stop itself obviously cannot be justified by what Frazier did in response to it. Frazier's supposedly nervous reaction might be relevant to the validity of the nonconsensual pat-down, but we cannot reach that question without first determining whether the initial stop was permissible. *Lozano*, 2023 IL 128609, ¶ 35 (citing *Arizona v. Johnson*, 555 U.S. 323, 326 (2009)).

¶ 28    That leaves only one thing: the majority relies on the trial court's finding that Frazier was in a "high-crime area." With all respect to my colleagues, that is not good enough. See *People v. Harris*, 2011 IL App (1st) 103382, ¶ 14 ("A conclusory and unsubstantiated statement that a location is a 'high crime area' is insufficient to establish that consideration for purposes of justifying a *Terry* stop."). An officer's claim that a stop occurred in a high-crime area " 'requires careful examination by the court.' " *Id.* (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000)). Why? " '[B]ecause such a description, unless properly limited and factually based, can easily serve as a proxy for race and ethnicity.' " *Id.* (quoting *Montero-Camargo*, 208 F.3d at 1138). It also serves as a convenient *ex post facto* justification for a suspicionless stop. The authors of a study of stops conducted in New York City between 2007 and 2012 described the results as showing that "officers [were] claiming that every block in New York City is high crime at one time or another." Ben Grunwald & Jeffrey Fagan, *The End of Intuition-Based High-Crime Areas*, 107 Cal. L. Rev. 345, 350 (2019).

¶ 29    If an investigative stop was purportedly justified because it took place in a high-crime area, the court must ask why. Is the observed behavior consistent with a type of crime that is unusually common in that area? *Id.* (citing *United States v. Wright*, 485 F.3d 45, 53-54 (1st Cir. 2007)). Are criminal acts focused on a particular part of a neighborhood, such as a specific intersection? *Id.*

(citing *Wright*, 485 F.3d at 54). Is the area experiencing a notable uptick in certain criminal activity? *Id.* (citing *Wright*, 485 F.3d at 54). Stated more generally, the court should evaluate how local circumstances, whatever they might be, affect how a reasonable officer might interpret otherwise innocuous conduct. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (explaining that officers need not "ignore the relevant characteristics of a location" when deciding whether to make an investigative stop).

¶ 30    So, what it is about East Chatham that made Frazier's behavior more indicative of a crime than it would have been in East Lakeview? The answer: nothing. The only evidence found in the record that goes beyond conclusory assertions that the area had "high crime" or was "an area of heavy attention" was one officer's trial testimony that the area the gas station was in was "known for high crime, narcotic [*sic*], gang conflict, and shootings." Taking that at face value, so what? Frazier was walking into a gas station, not lingering on a street corner, flashing gang signs, or rolling down a rear window to do a drive-by. The label "high-crime area" has no significance unto itself. When divorced from factual meaning, it does not supply reasonable suspicion that is otherwise lacking. To hold otherwise would mean that people who live in, work in, shop in, or merely travel through "high-crime areas" are inherently more criminally suspect than everybody else.

¶ 31    The right to be free from unreasonable searches and seizures applies regardless of race, class, creed, or locality. The officers in this case might have reasonably suspected that Frazier had a gun, but the evidence did not disclose a basis for reasonably suspecting that Frazier was committing or about to commit a criminal offense, and the fact that Frazier happened to be in a "high-crime area" makes no difference under the circumstances of this case. Because the gun was

found during a search arising out of an investigative stop not supported by a reasonable suspicion of criminal activity, the trial court should have granted the motion to suppress. For these reasons, I respectfully dissent.